[Civil No. 1588. Filed December 22, 1917.]

[169 Pac. 596.]

## GEORGE W. P. HUNT, Appellant, v. THOMAS E. CAMPBELL, Appellee.

1. APPEAL AND ERROR—REVIEW—WAIVER OF ERRORS.—Where no prejudice by reason of defects in the pleadings resulted to either party, and by stipulation they entered into trial of the election contest on the merits, exceptions to the pleadings will be deemed waived.

2. JUDGMENT—EVIDENCE—SUSPICION.—No court can render a judgment on suspicion.

3. EVIDENCE—PRESUMPTIONS—OFFICIAL ACTS.—There is a presumption that public officials acted in good faith.

4. ELECTIONS—CONTESTS—REJECTION OF PRECINCT VOTES.—The courts will reject the votes of an entire precinct, and disfranchise all of the electors only where an imperative public necessity requires, and it is impossible to compute the wrong requiring the rejection of some of the ballots.

5. APPEAL AND ERROR—REVIEW—FINDINGS.—The appellate court is not permitted to look behind the findings of the trial court, when it is a matter of weighing the evidence, or pertaining to the credibility of the witnesses.

6. ELECTIONS—REJECTION OF BALLOTS—PRECINCT—ELECTION OFFICIALS. Though some of the election officials of a precinct were not residents of that particular precinct, as required by law, the whole of the ballots of the precinct will not for that reason be rejected, where the objection was not raised until after the election; for, there being nothing in the statute requiring rejection in such case, the courts will construe the statute as directory, and not mandatory.

7. ELECTIONS—CONTESTS—FRAUD—BURDEN OF PROOF.—Fraud is never presumed, but must be alleged and proven; therefore a party seeking to overcome the *prima facie* case made by the election returns on the ground that certain ballots had been fraudulently changed and counted must produce sufficient proof to establish the charge.

8. ELECTIONS—CONTESTS—FRAUD—EVIDENCE.—An election fraud, like any other fact, may be proven by circumstantial evidence, but the *quantum* of proof must be sufficient to establish the fraud.

[As to competency of circumstantial evidence to prove for whom illegal votes were cast at election, see note in Ann. Cas. 1912C, 522.]

9. EVIDENCE — ADMISSIBILITY—HEARSAY—ADMISSIONS.—Testimony that an election official told a third person that another official fraudulently changed numerous ballots, and that he changed only one ballot, is inadmissible, being hearsay, in so far as the election official described the acts of his fellow official, though admissible as an admission with respect to the election official's own misdeed.

10. ELECTIONS—BALLOTS—FRAUD.—In an election contest evidence *held* insufficient to show that election officials changed ballots from one candidate to another, and to warrant the court in taking votes from the contestant and giving them to the contestee.

11. ELECTIONS—FRAUD—MUTILATED BALLOTS.—The returns of the official board are *prima facie* evidence of the votes cast, and though an inspection of the ballots showed mutilation and alteration, the court cannot without any other evidence take votes from one candidate and give them to another, for to destroy the credit of the official returns there must be unequivocal evidence of fraud, and if the circumstances of the case can be explained upon the hypothesis of good faith, that explanation will prevail.

12. ELECTIONS—BALLOTS—CONSIDERATION.—Where the ballots of a precinct were never canvassed by the board of supervisors, and were certified as missing, a package of ballots purporting to be those of the missing precinct cannot, where they were not preserved in compliance with the statute, be considered, the county treasurer having discovered them in his office at the time he was packing the other

ballots to bring them into court, the ballots so found having been placed in the treasurer's office by persons unknown.

13. ELECTIONS — RETURNS—CERTIFICATION—CONSIDERATION.—Civil Code of 1913, paragraph 3003, declares that the board of supervisors of a county must meet on the second Monday after each election to canvass the returns. Paragraph 3004 declares that, if at the time of meeting the returns from each precinct in which polls were opened have been received, the board must canvass such returns, but, if all the returns have not been received, the canvass must be postponed until all returns are received, or six postponements have been had. The board of supervisors of a county met on the second Monday after the election and canvassed the returns from the precincts that had been received, but entered on its minutes an order of adjournment before the expiration of the six-day period without canvassing the returns from a particular precinct which were duly received within the time the board is required to be in session to make the canvass. Thereafter the board reconvened within the six-day period and canvassed the returns. *Held*, that the returns of such precinct should be considered; the first adjournment of the board being improper.

14. MANDAMUS — COMPELLING CANVASS OF ELECTION RETURNS. — The board of county supervisors, which is required to canvass returns of an election may, by *mandamus*, be compelled to canvass the returns, where it failed to perform its duty as required by law.

15. ELECTIONS—BALLOTS—DUTY OF VOTER.—Civil Code of 1913, paragraph 2940, declares that any person desiring to vote for all of the candidates of any political party may do so by placing a cross in the square at the top of the column under the name of such party, otherwise he may vote for any candidate by placing his cross in the square opposite the name of such candidate; while paragraph 2941 provides for notice to voters to put an X in the square after the name of each candidate they wish to vote for. Paragraph 2943 provides that the voter shall mark his ballots in the voting booth, and that he may write the name of any person on the blank lines below the names of the candidates printed on the ballot for the particular office for which he desires to vote for such person, and mark the same with an X in the square opposite the blank line. Paragraph 2955 further provides for the preparation of ballots by voters. *Held* that, as one too illiterate to mark his ballot substantially as the law directs cannot for that reason be assisted, no person being entitled to assistance except in the case of physical disability, as prescribed by paragraph 2958, a voter must express his choice substantially in the manner provided by statute, or his ballot cannot be counted.

16. ELECTIONS — BALLOTS — COUNTING. — Civil Code of 1913, paragraph 2932, prescribing the form of ballots, provides a separate column

within vertical lines on the official ballot for each political party requiring the names of all candidates of a particular party, except judges and members of the tax commission, to appear within the column set apart for that political party, and after the name of each candidate within the column a dotted line is run to a square placed within each column opposite the name of the candidate. Paragraphs 2940, 2941, and 2943 provide that the voter, if not desiring to vote a straight ticket by marking an X in the square at the top of the party column, shall mark·an X in the squares opposite and to the right of the names of the individual candidates. Ballots on which the voter had marked an X in the square within the lines of the Prohibition column opposite the place where the name of the Prohibition candidate for Governor, if there had been one, should have appeared, were counted for the Republican candidate, although the column of the Republican party was to the left of that for the Prohibition party. *Held,* that such ballots should not have been counted for the Republican candidate; there being nothing to show that the voter intended to vote for him, although his name happened to be closest to the square marked.

17. ELECTIONS — BALLOTS — MARKING. — A voter marked an X in the square at the top of the party column and placed a separate X in the squares after the names of all other party candidates than the candidate for Governor. Civil Code of 1913, paragraphs 2940, 2941, authorizes the voting of a straight party ticket by placing an X in the square at the top of the party column, and authorize an elector not voting a straight ticket to vote for any candidate by placing his X in the square opposite the name of each candidate. Paragraph 2959 declares that, if the voter marks more names than there are persons to be elected to an office, or if for any reason it is impossible to determine his choice for any office to be filled, his ballot shall not be counted for such office; while paragraph 2979 declares that, if the names of more persons are designated on any ballot for the same office than are to be chosen for such office, then all the names designated for such office shall be rejected. *Held* that, as the marking of additional crosses in the squares opposite the names of the individual candidates added nothing to the efficacy of the cross in the party column, and did not appear to be distinguishing marks, the ballot should be counted for the party candidate for Governor.

18. ELECTIONS—BALLOTS—MARKING.—Where ballots having an X at the top of a party column were marked with an X in the square after the name of a candidate of another party, the ballots as to such office must be rejected; there being a candidate for such office in the party column so marked.

19. ELECTIONS—BALLOTS—COUNTING.—Where ballots were marked with a cross or X in the square of one party column, and an X in the square at the top of another party column, but one of the parties

XIX Ariz.—17

so voted for had no candidate for Governor, the ballots should be counted for the other party candidate for that office.

20. ELECTIONS — BALLOT — CONSIDERATION—COUNTING.—Ballots marked with a cross or X in the square at the top of one party column, and which were marked with a cross in the square opposite the name of the candidate of another party for Governor, may be counted for such candidate, where the party whose column was marked with an X submitted no candidate for that office.

21. ELECTIONS—BALLOT—CONSIDERATION—COUNTING.—Ballots in which the name of a candidate was written in, but no X was marked in the square opposite his name, either as printed on the ballot or so written thereon, cannot be counted; Civil Code of 1913, paragraph 2932, declaring that in the column at the right of the name of the candidate and on the same line there shall be a space so inclosed as to make a square in which the voter may designate his choice by an X, and below such name shall be placed as many blank lines as there are offices of the kind to fill, and in like manner a square shall be placed after such blank space in which blank space the voter may write the names of any person or persons for whom he desires to vote, and in the squares opposite shall designate his choice by an X as in the case of printed names.

22. ELECTIONS — BALLOTS — CONSIDERATION—"ST. ANTHONY'S CROSS"— "ST. ANDREW'S CROSS" — "LATIN CROSS" — "GREEK CROSS." — Civil Code of 1913, paragraphs 2929, 2940, 2941, 2943, referring to the means by which a voter shall express his selection, require the voting squares to be marked with a cross, although in some instances the statute refers to such cross as an X. There are four principal forms of the cross: the St. Andrew's cross, which is made in the form of an X; the Latin cross †, as used in the crucifixion; St. Anthony's cross, which is made in the form of a T; and the Greek cross, +, which is made by the intersection at right angles of lines at their center point. A cross practically in the form of a Y is used in certain departments of applied science. *Held* that, as a cross is in many varying forms, a ballot, if marked with a symbol indicating that the voter made a *bona fide* effort to make a cross and mark it substantially within the square, should be counted, although the cross was not perfect, and was not exactly in the form of an X.

23. ELECTIONS—BALLOTS—DISTINGUISHING MARK.—Where a voter wrote the word "Yes" in the voting square opposite a candidate's name, and over the word marked a cross, and it did not appear that he intended to place a distinguishing mark on his ballot, but merely wished to emphasize his choice, the ballot should be counted.

24. ELECTIONS — BALLOTS — MARKING. — Ballots marked with the word "Yes" at the top of the party column or with the word "Yes" after the name of a candidate should not be counted, not being marked with a cross in the square as required.

25. ELECTIONS—BALLOTS—DISTINGUISHING MARK.—Where there was no evidence that the voter who marked his ballot with a cross and wrote in the word "Yes" on the dotted line after the name of a candidate intended to place a distinguishing mark thereon, it appearing that he merely wished to emphasize his choice, the ballot should be counted.

26. ELECTIONS—BALLOTS—CROSS.—Where a ballot was marked with intersecting lines which would have been in the form of an X had the lines been prolonged, and there was the faintest intersection of the lines, such ballot should be counted, showing an honest effort to mark a cross.

27. ELECTIONS—BALLOTS—CROSSES.—Ballots marked with vertical lines in the voting squares or with diagonal lines, where there was only one line and no showing of an attempt to make the cross, should not be counted.

28. ELECTIONS — BALLOTS — CROSSES. — Where the ballot in the voting square at the top of a party column was marked with a cross, it will not be rejected because the lines of the cross extended somewhat below the lower lines of the square; it not being contended that this was a distinguishing mark.

29. ELECTIONS—BALLOTS—CROSSES.—Where crosses with which ballots were marked showed that the voters were suffering with palsy or unsteady hands, but indicated an attempt to make a proper cross, they should be counted.

30. ELECTIONS—BALLOTS—CROSSES—CHECK—MARKS.—A ballot marked with a check mark in the voting square instead of a cross cannot be counted.

31. ELECTIONS — BALLOTS — CROSSES. — A ballot marked with the figure 1 in the voting square cannot be counted for the candidate, particularly where the elector made excellent crosses in other places in his ballot.

32. ELECTIONS — BALLOTS — DISTINGUISHING MARKS. — A ballot marked with a proper cross should be counted, although the elector made more lines than necessary; it not being contended that such lines amounted to distinguishing marks.

33. ELECTIONS—BALLOTS—CROSS.—Ballots marked with a cross in the square opposite the dotted lines left blank under the name of a candidate to enable the voter to express his choice by writing in the name of any one desired cannot be counted as a vote for the candidate on the theory that the voter might have been suffering from astigmatism, the statute prescribing the means for a voter under physical disability to obtain assistance, and the theory of astigmatism being weakened by the fact that the voter in other places properly marked his ballot.

34. ELECTIONS—BALLOTS—DISTINGUISHING MARK.—Civil Code of 1913, paragraph 2982, declares that, when a ballot found in any ballot-

box bears upon it any device or color, or thing, or is folded in a manner intended to designate or impart knowledge of the person who voted such ballot, it must be rejected. Paragraph 2983 declares that, when the board of election rejects a ballot, it must at the time of such rejection, cause to be made thereon and signed by a majority of the board an indorsement of such rejection, and of the causes thereof; while paragraph 2984 declares that all rejected ballots must be preserved and returned in the same manner as other ballots. Paragraph 2985 declares that, whenever a question arises in the board as to the legality of a ballot or any part thereof, and the board decides in favor of the legality, such action, together with a concise statement of the facts that gave rise to the objection, must be indorsed upon the ballot and signed by a majority of the board. *Held* that, as it is not every unauthorized mark on a ballot or peculiar method of folding that will warrant its rejection, and a ballot can only be rejected when it is marked or folded in such a manner as to designate or impart knowledge of the person who voted, election officers should at the time of counting ballots make records of any distinguishing marks, and ballots bearing no notation by election officers as to distinguishing marks should not thereafter, merely because found to bear unauthorized marks, be rejected; it not appearing who put the marks thereon or that they tended to disclose knowledge of the voter.

35. ELECTIONS — BALLOTS — DISTINGUISHING MARKS. — Where a voter marked his cross in the Democratic column at the top of the ballots, and then drew a line to the space where the names of the Democratic candidates for presidential electors were printed, and along this line wrote the word "Wilson," the ballot should be rejected under Civil Code of 1913, paragraph 2982, providing for the rejection of ballots bearing distinguishing marks; the voter having deliberately placed on his ballot an unauthorized mark.

36. ELECTIONS — BALLOTS—DISTINGUISHING MARKS.—Under such paragraph, where a voter having marked a cross in the square at the top of the Democratic column, and in the square for voting on an initiative petition drew an oblique line extending it beyond the square, and then in large letters wrote the words, "I vote Yes," heavily underscored, the ballot should be rejected as bearing a distinguishing mark; the voter having deliberately placed thereon an unauthorized mark.

37. ELECTIONS — CONTEST — REVIEW — QUESTIONS FOR DETERMINATION. Where the rejection or retention of the votes from a particular precinct could not affect the result of the election, the question whether such precinct should or should not have been counted need not be determined on appeal in an election contest.

38. ELECTIONS — CONTEST — REVIEW — ASSIGNMENT OF ERROR — CONDITIONAL ASSIGNMENTS.—Where the contestee made a number of as-

signments provisionally, that is, if the court rejected a particular precinct, then the contestee urged the rejection of certain other precincts, such conditional assignments need not be considered by the appellate court, where it did not determine the question of the rejection of the particular precinct, on the ground that the retention or rejection of the votes thereof would not affect the result.

39. ELECTIONS—CONTEST—BALLOTS—ADMISSIBILITY.—Where ballots are preserved in strict accordance with the statutory requirements, they are admissible in evidence without further proof.

40. ELECTIONS—CONTEST—RIGHT OF REVIEW.—A judgment in an election contest case is an appealable one.

41. ELECTIONS—CONTESTS—COSTS.—As it is only by special statute in an election contest that the prevailing party may be allowed judgment for costs, a party prevailing in an election-contest is not entitled to costs other than those prescribed by Civil Code of 1913, paragraph 3069, allowing compensation of the persons making inspection of the ballots in preparation for the trial of the contest to be taxed against the defeated party as costs.

42. ELECTIONS—APPEAL—COSTS—ALLOWANCE.—A judgment in an election contest being appealable, costs of appeal may be allowed to the successful party.

APPEAL from a judgment of the Superior Court of the county of Maricopa.. R. C. Stanford, Judge. Reversed.

Mr. Eugene S. Ives, Mr. F. C. Struckmeyer, Mr. Thomas W. Nealon and Mr. Louis B. Whitney, for Appellant.

Mr. Richard E. Sloan, Mr. John H. Campbell, Messrs. Bullard & Jacobs and Mr. J. L. Gust, for Appellee.

FRANKLIN, C. J.—This is an election contest. At the general election held in the state of Arizona on the seventh day of November, 1916, the contestant, who is the appellant; here, and the contestee, who is the appellee, were rival candidates for the office of Governor. On the face of the official returns made to the Secretary of State and canvassed by him the contestee received the highest number of votes given for any candidate for the office. The Secretary of State thereupon, as the law provides, declared the contestee elected to. the office of Governor of Arizona, and in due course issued and delivered to the contestee a certificate of his election. The superior court in which the contest was tried found that the number of legal votes cast at said election for the con-

testee, Thomas E. Campbell, was 28,151, and that the number
of legal votes cast at said election for the contestant, George
W. P. Hunt, was 28,084. Thereupon the court gave judg-
ment that said contestee, Thomas E. Campbell, was duly
elected to the office of Governor of the state of Arizona at said
election, and was and is entitled to the said certificate of elec-
tion issued to him.

Exceptions to the pleadings upon which the contest case
was tried have been taken by both parties. In view, however,
of the stipulation entered into by the parties for the trial
of the contest, and the parties having joined issue upon the
disputed points, neither party being restricted in the offer of
proof by reason of any technical objection to the pleadings,
and no prejudice resulting either to the contestant or con-
testee, it is obvious that this case ought to be decided upon
its merits, and these objections to the pleadings be deemed
waived by the respective parties.

The official returns of the canvass of precinct No. 1 in Doug-
las, Cochise county, show that contestant received 229 votes
and the contestee received 106. During the progress of the
contest trial the contestee amended his answer and attacked
this precinct on the ground of fraud. · It is alleged in the
amended answer that:

"By reason of misconduct on the part of the election board
of precinct No. 1 in Douglas, Cochise county, Arizona, at said
election, a large number of ballots that had been properly
and duly marked by the voters who cast the same so as to
indicate their intent to vote for contestee were fraudulently
changed by members of said election board by the partial
erasure of the marks placed thereon by said voters and by
fraudulently placing other marks thereon and said ballots so
fraudulently changed and marked by said election board were
wrongfully counted for contestant, and the number of these
were 123 or more."

Thenceforward the heat of the contest raged furiously
around Douglas No. 1. It became the very head and front
of the engagement, and its disposition is decisive of the con-
test. Nothing apparently has been left undone to picture
before the court the conditions existing there on election day,
even to the most minute particulars and trivial circumstances.

The Thiel Detective Service Company of Los Angeles, Cali-
fornia, was employed in behalf of the contestee to furnish evi-

dence regarding conditions in Douglas No. 1. Quite a number of their men were detailed upon the case with instructions to get acquainted with persons who had knowledge of what went on in Douglas, and especially with the election board, and particularly Art Pearson. They appear to have done their work thoroughly in ferreting out every clue and circumstance obtainable. Attorneys for contestant assert that these detectives admit:

"That their chief asset in the successful conduct of their 'profession' is the natural or acquired habit of successful mendacity and deceit."

This assertion is based, perhaps, only upon their inference from the evidence, but it does appear that an ability to be effective or obtain a given result is an important factor in obtaining and upbuilding a profitable employment in this line of endeavor. Like the pupils of Wackford Squeers, who, before spelling the word, were told to go out and wash WINDER, and, after the washing is done, come bank and spell winder. The evidence they produce, however, when competent and material, is legitimate evidence, and an appellate court will attach to it that weight and that credibility given by the trial court; no more, no less. Wide publicity has been given to alleged fraudulent practices in this Douglas No. 1. In this country every individual has a right to private judgment, and may offer his sentiments freely to others. Private judgment has, no doubt, been published many times, and perhaps so often tinctured, as might be expected, with party bias or with party prejudice. In the fervor of political contests this must be expected. Then we have the warmth of discussion in the oral argument of counsel before the bar of the court, in which this charge of fraud is vehemently asserted, to invigorate our solitary study of the case in the dispassionate temperature of the judicial chambers. All of this stimulates our powers for cool and solid judgment. Recollecting the weakness of our judgments and the vain presumption of hastily deciding on important subjects without mature deliberation and the thorough knowledge of the facts presented by the record in a given case, the people have adopted a legal code by which the judgments of their courts are to be regulated, and which body of rules their judicial officers are commanded to obey, and by this legal code the court is not permitted to found its decrees upon public rumor,

or upon evidence about which a mere theory, suspicion, or conjecture may be maintained. The opinions of the court are published to the world and remain upon its archives for all time, and their errors and injustice, if any, may be detected and exposed. We have this high responsibility at the bar of the public. And though it may be thought by some that a court would be disposed to promote the views of a party, such considerations would make it tremble at the idea of doing this were it not moved otherwise by the pride of its reputation and honor.

To be impartial and correct is therefore our duty. If, under the facts of the case and by the rules of law, the contestant is entitled to the votes of this precinct, he ought to have them, and this court must not be deterred in the performance of a duty so plain by any reason of the political affiliation of its members, or because to some its judgment for considerations of such a character may appear not to be impartial unless it be against the contestant or unfair to him. It must be kept in mind that no court in Christendom is permitted to found its judgment upon mere suspicion and conjecture of wrongdoing, but, unless there be satisfactory evidence to the contrary, to look upon the acts of public officials with a presumption of their rectitude and good faith.

"In no case is it more imperative than in election contests that the maxim should be applied that the burden of proving fraud is upon him who alleges it. It ought never to be inferred from slight irregularities, unconnected with incriminating circumstances; nor should it be held as established by mere suspicions, often having no higher origin than partisan bias and political prejudices." *Bingham* v. *Broadwell*, 73 Neb. 605, 103 N. W. 323.

Thus prepared, we shall look at the charge of fraud in Douglas precinct No. 1, and, putting it with the recorded facts in the retort and by the aid of legal principles then with some violence of fire, discover, if we may, what of dross and alloy is to be found in all this.

At first the court rejected the entire precinct, but later, on more mature reflection and deliberate consideration, the ruling was set aside. Said the court:

"I have heard the evidence, and I now give those votes to Campbell that I feel were taken from Campbell and given to Hunt. By Mr. Ives: When? By the Court: At some time

during the count or shortly afterward, somewhere along there. By Mr. Bullard: And the tally sheets should show 42 more votes for Campbell and 42 less for Hunt? By the Court: Yes; that is all."

The contestee assigns error as follows:

"The court erred in rescinding its ruling striking out the precinct of Douglas No. 1 for the reason that the evidence shows gross misconduct and actual fraud to have been committed by the election officers therein as follows: The court found from the evidence that 42 ballots cast for appellee, and which should have been counted for appellee, were fraudulently changed by said election officers and counted for appellant, and that 5 additional ballots which as originally marked by the voters should not have been counted for appellant were fraudulently changed and fraudulently counted for appellant; that both said 42 ballots and said 5 ballots showed upon their face that they had been so fraudulently changed; that certain other ballots are shown to have been fraudulently changed by said election officers in the interest of a certain candidate for the office of justice of the peace; that the evidence indicated that, in addition to said 47 ballots, certain other ballots, the number of which may not with certainty be ascertained, were fraudulently changed in the interest of appellant and counted for appellant; and that therefore the counting of said 42 ballots for appellee and the taking of said ballots from appellant's column did not purge the returns from said precinct of all of the fraud committed by said election officers with respect to the office of Governor."

It is to be observed that the fraud imputed to this precinct by contestee in his answer and assignment is not that kind of fraud, such as intimidation, bribery, or violence, or other misconduct so flagrant that the extent of its influence may rarely, if ever, be exactly computed, and the evil influence of which is so diffusive that the result of the election is made uncertain. It is said in 9 R. C. L., Elections, § 107:

"There is a distinction between particular illegal votes the effect of which may be proven and exactly computed and fraudulent combinations, coercion, and intimidation. It can never be precisely estimated how far the latter extends. Their effect cannot be arithmetically computed. It would be to encourage such things as part of the ordinary machinery of political contests to hold that they shall avoid only to the

extent that their influence may be computed. So wherever such practices or influences are shown to have prevailed, not slightly and in individual cases, but generally, so as to render the result uncertain, the entire vote so affected must be rejected.''

It is influence of this sort in those cases where the extent thereof may be determined with reasonable certainty, which is rarely the case, that it is the duty of the court to purge the returns of such fraud. A court, however, will exercise the power to reject the votes of an entire precinct and disfranchise a body of electors only where an imperative public necessity requires. It will do so as a last resort where it is found impossible to compute the wrong. If the illegal effect may be proven and computed with reasonable certainty, the returns will be purged to that extent only. But it is obvious here that, if the asserted fraud exists at all, it consists in the election officers fraudulently changing specific ballots which were marked and voted for contestee to appear as if marked and voted for contestant and counting them as voted for contestant. It is apparent that, if the proofs adduced are sufficient to justify the trial court in finding that such ballots were so fraudulently changed and counted, the identical proof that would sustain it must necessarily and with reasonable precision compute the extent of the fraud perpetrated. But, aside from these observations, this court is not permitted to look behind the finding of the trial court when it is a matter of weighing the evidence or pertaining to the credibility of the witnesses.

We get a clear idea from the statements of the court that his first ruling to discard the entire returns of Douglas precinct No. 1 was based upon two facts brought out in the evidence, namely, that some of the election officers were not residents of that particular precinct, and that a person whose name appeared on the official ballot as one of the candidates for presidential elector helped for a short time to canvass some of the votes. The other matters pertaining to the fraudulent conduct of the election the court regarded as mere theories on the part of contestee, and, except as to the mutilated ballots themselves, as having so substantial basis in any evidence produced. The court rejected as nothing but a theory the notion that some of the election officers went into the booths and marked these ballots. Likewise the theory

that one of the election officers placed these ballots on his knee and mutilated them in the presence of the other members of the board and of the numerous spectators present during the progress of the count. There was sharp conflict in the testimony regarding one member of the election board, Art Pearson, being in an almost helpless state of intoxication during the canvass, and betting small sums of money on the election of contestant. The court in making the ruling did not even consider these matters as having any basis in the testimony. Said the court:

"I will not consider the matter of the whiskey and gambling at the polls."

We make but a brief extract from the many observations of the court to put this matter clear.

"By the Court: If I may help you further, that neither the theory of the Campbell side that the ballots were marked during the progress of the count and while the ballots were spread upon the table, neither that theory seems plausible to the court, nor the theory that they were marked in the booth, the theory first of the Campbell side is set aside by the fact that the marks are made too straight and too good to be made quickly, and while a person was handing them over in the open, and too plain also; and the theory of the other side, as I said is set aside for many reasons. It does seem as though the witnesses on the stand were so terribly mixed in their evidence and so uncertain that I could hardly believe they were truthful in their statements that they went into the booths and helped the people mark the ballots, so I really had to set both aside in arriving at a conclusion of it.

"I will say to you it was very doubtful whether the Republican side under the evidence they produced here had a very strong case when they finished. When I heard such men as Mr. Cross and Mr. Elvey take the stand and say nothing irregular when they were there, those spectators being present, it was very doubtful, and I thought it was proper to let you put in your evidence just like I thought it was proper for the surrebuttal of the other side to come in."

Now, concerning the action of the court in rescinding its ruling rejecting the votes of the entire precinct, no fault can be found with it. It is not pretended that the candidate who assisted the election officers in canvassing a few of the votes had any sinister influence upon the result. If the statute

provides that only residents of the precinct shall be appointed as election officers, the provision could have been enforced by *mandamus* prior to the election, and no court would be justified in rejecting the vote cast in the precinct on the mere ground of a noncompliance in this particular, it not resulting in actual fraud. In the absence of an imperative mandate of the statute to do otherwise, courts will construe such a provision as directory merely in so far as a failure to comply with it is concerned when it is first called in question after the election. McCrary on Elections, § 233; 9 R. C. L., Elections, § 33.

The question, however, does not appear to occur in this case, because the proof is conclusive that all of the election officers who officiated were residents and electors of the Douglas precinct. This precinct is divided into four polling places named Douglas precinct No. 1, Douglas precinct No. 2, Douglas precinct No. 3, and Douglas precinct No. 4. The statute merely requiring an officer to be a resident of the precinct, if a person so appointed was a resident thereof, but his residence did not happen to be within the defined boundaries of the particular polling place at which he officiated, this, of course, would not be a disqualification under the statute.

Coming now to the alleged fraudulent changing and counting of certain of the ballots cast in the precinct, the returns of the election officers are *prima facie* correct and free from the imputation of fraud. The presumption is in favor of the good faith and honesty of the members of the election board. Regarding their official conduct, like all public officials, courts never presume fraud against them to impeach their official acts. The wisdom of ages, ingrafted upon the jurisprudence of all civilized countries, is to the effect that fraud must be specifically charged, and the allegations sustained by clear and satisfactory proof. When a party seeks to overcome the *prima facie* case made by the returns of an election with the allegation that certain of the ballots have been fraudulently changed and counted by the election officers, he must produce the *quantum* of proof necessary to sustain the charge.

Said the predecessor of this court in the case of *Oakes* v. *Finlay*, 5 Ariz. 390, 53 Pac. 173:

. "In determining the results of our popular elections, it has been generally held that the returns from the election board, when legally and properly authenticated, are not only con-

clusive upon the board of canvassing officers, but are also *prima facie* evidence of the number of votes cast in a proceeding to contest the election; and the burden of proof is upon the person who assails the correctness of these returns. It has likewise been generally held that, where the identical ballots that were cast at the election have been properly preserved so that they can be recounted by the order of the court, they will govern when there is a difference between them and the returns; but it has been held, in the revision of the returns or in a contest over the count as made by the canvassing board, that while the ballots are the best evidence of the manner in which the electors have voted, being silent witnesses which can neither err nor lie, they are the best evidence only when their integrity can be satisfactorily established. One who relies, therefore, upon overcoming the *prima facie* correctness of the official canvass by a resort to the ballots, must first show that the ballots as presented to the court are intact and genuine. *Tebbe* v. *Smith,* 108 Cal. 101, 49 Am. St. Rep. 68, 29 L. R. A. 673, 41 Pac. 454. In cases where there has been a doubt in regard to the genuineness or identity of the ballots as those that were actually cast, or in regard to the further question whether the identical ballots cast were in the same condition when presented in court as when voted at the election, the courts have been extremely careful in admitting them in evidence to overturn or contradict the result of the election as shown by the returns of the canvassing board. To preserve the prevailing force of the ballots as evidence there must be a reasonable observance of all the prescribed conditions for the safekeeping of the ballots. It is the duty of the court so far to adhere to the substantial requirements of the law in regard to elections as to preserve them from abuses subversive of the right of electors. And under this view the question becomes a broader one than can be disposed of by answering that in the individual case no harm resulted.

"As to the controlling force of the ballots as evidence contradistinguished from the returns of the election officers, *Spidle* v. *McCracken,* 45 Kan. 356, 25 Pac. 897, holds: 'That the returns of the election officers are *prima facie* evidence of what they purport to show with regard to the number of votes cast, and for whom cast, has primarily been held by this court, and has been so held by every other court to whom

the question has been presented; and, in the absence of any contradictory evidence, they are conclusive. It has also been held by this court in the case of *Dorey* v. *Lynn,* 31 Kan. 758, 3 Pac. 557, and in other cases, that, whenever the ballots cast at the election can be properly identified, they are the best evidence, and much better and more reliable than a mere abstract or summary of the same made by the election officers; but whenever it has been shown that they have been wrongfully tampered with (as has been shown in the present case), they lose their controlling character as evidence, and, where there is nothing else than these discredited ballots to contradict, the returns will be held conclusive.' This decision was rendered in a case where unquestionably the ballots presented were the identical ballots that had been cast; but the evidence before the court did not sustain the fact that they had been inviolably kept from the election until presented in court. On the contrary, their appearance seemed very strongly to indicate that they had been altered and presented a different appearance when offered in court than when passed upon by the returning board. . . .

"The ballots were canvassed by the returning board at the close of the day of the election. They had before them the ballots that had been cast. They made their returns, in which they certified the number of votes cast for each candidate. These returns constitute the highest evidence that can be adduced in support of that fact, with the one single exception of the recount in court of the identical ballots that were cast; and the return thus made cannot be overturned or set aside upon any other evidence than upon a recount in court of the identical ballots that were thus counted by the returning board at the date of the election. If that is done, and by that count made under the direction of the court a mistaken return by the canvassing board is demonstrated, that, and that alone, is of a sufficiently controlling character to overturn the finding already made.

"In *Young* v. *Deming,* 9 Utah, 204, 33 Pac. 818, the supreme court of Utah held that 'the fact that such ballots, if cast for contestant, would have changed the result of the election, is not ground for disturbing the result as returned by the inspectors, in the absence of positive evidence that they were so cast.' The court said it is deemed unwise to lay down any rule by which the certainty and accuracy of an

election may be jeopardized by the reliance upon any proof affecting such results that is not of the most clear and conclusive character. The temptation to actual fraud and corruption on the part of the candidates and their political supporters is never so great as when it is known precisely how many votes it will take to change the result; and men who are willing to sell their votes before election will quite as readily sell their testimony afterward, especially as the means of detecting perjury and falsehood are not always at hand until after the wrong sought to be accomplished by it has become successful and the honest will of the people has been thwarted.''

It is not to be thought that in order to sustain a charge of fraud it is necessary that the fraudulent act be proven by direct testimony. Fraud is a question of fact and like any other fact may be proved by circumstantial evidence. But by whatever kind of proof the charge is sought to be sustained, the *quantum* of it must be sufficient to establish the fraud. In volume 6 Am. & Eng. Ency. Law (3d ed.), page 354, this language is used:

''The maxim that 'fraud is not to be presumed' applies as well to the conduct of elections, and making returns, as to transactions between individuals; and there is also a stronger presumption against fraud, which arises from the acts of public officers, acting under the sanction of their official oaths; and nothing but the most credible, positive, and unequivocal evidence should be permitted to destroy the credit of official returns. It is not sufficient to cast suspicion upon them; they must be proved fraudulent before they are rejected.''

If the ruling of the trial court in taking 42 of these mutilated ballots from contestant and giving them to contestee is to be sustained and the official returns discarded, it must be because there is some substantial evidence in the record that such ballots were voted for contestee, and were fraudulently changed by members of the election board and fraudulently counted for the contestant. It must be borne in mind that this court is not permitted to look behind the finding of the trial court when it is a matter of weighing the evidence or giving credibility to the testimony, but it is fundamentally true that, where there is substantially no evidence competent to establish the charge made, or justify the action of the trial court, then it becomes a pure question of law for the appel-

late court to decide. There may be ground in the evidence upon which a theory may be indulged, a suspicion awakened, and possibly some conjecture as to how and when and where and by whom these ballots were mutilated. Each side to the contest indulges plentifully in all this, but such considerations are not sufficient upon which to base a judgment that 42 ballots were cast for contestee and fraudulently changed and counted for contestant, and thus defeat the official returns by transferring votes so as to increase the vote of contestee 42 votes and decrease the vote of contestant 42 votes. As we have seen, the lower court found against the theory that votes were fraudulently changed in the election booths, against the theory that votes were fraudulently changed during the progress of the canvass. There is not even a scintilla of evidence that any of these ballots were changed during the progress of the count. The suspicion as to the alleged fraudulent conduct was most strongly directed against one Art Pearson, one of the election officials, who, according to testimony in behalf of contestee, was in a highly intoxicated condition all the time. It must have appeared most extraordinary to the lower court, as it does to this court, that a man in such a condition, in the presence of the election board composed of Republicans and Democrats, with party watchers on hand, and with spectators constantly coming and going, and the canvass going on in a public room with the doors constantly open and adjoining the office of the city police with but a glass partition separating it from the police office. All of the election officers swore that there was no tampering with the ballots; no bystander observed anything wrong being done; no party watcher made any complaint. Every bit of the testimony of those in a position to know or observe the progress of the official canvass is unequivocally to the effect that nothing wrong was done. The nearest approach to anything of the kind is the testimony of Mr. Bruce Stephenson, who says he was in and out of place from 8 o'clock P. M. all night long. Some of the time he and Mr. Pickett were together, but when one of them was away the other one was there. Mr. Stephenson is an assistant county attorney for Cochise county. Mr. Pickett is a lawyer, and was a successful candidate at the election for presidential elector. Mr. Stephenson said he saw Pearson have in his left hand a short pencil about an inch in length, which he held in the hollow

of his hand so as to hide it from view, and as the ballots were spread out saw him making motions and passing over the ballots in a way to indicate they were being marked. He immediately told Mr. Pickett, who was present in the room, what he had seen, and that he believed the ballots were being changed. Pearson was one of the election officers, and his duty was to take the ballots out of the box, open and spread them upon the table, and then pass them on to other officers. In performing this duty Pearson must, of course, have handled the ballots. It would have been an utter impossibility to handle the ballots thus without some physical manipulation of them. That Stephenson's suspicions had no basis in fact is clear. He communicated these suspicions to Mr. Pickett, who was present with him, and then, as he says, "riveted" his eyes upon the ballots. He could easily have observed the condition of the ballots as they were taken out of the box and spread open upon the table. With his careful scrutiny directed by a suspicion in his mind, he failed to observe any ballot being marked or anything wrong being done. Neither did Mr. Pickett observe anything wrong. Mr. Stephenson communicated his suspicions to others, one of them being a deputy sheriff who was requested to watch; among others the county attorney and a member of the Republican committee. It is significant, too, that there has been no attempt at a prosecution for this alleged criminal misconduct. That the ballots were exhibits in the contest court is no excuse for this. The superior court and this court have ample power to make provision for their use as evidence in any other case when necessary. No one with this watchful vigil was able to observe anything wrong. It is incredible that these ballots could have been erased and marked or fraudulently tampered with under the circumstances without the perpetrator being caught red-handed in the act. With party fervor boiling so intensely, with those interested in the defeat of contestant alert in watching, with a knowledge that suspicions were entertained of fraudulent practices directed toward members of the election board, it is not to be believed that any such fraudulent tampering with the ballots could have occurred. There was not one witness examined who observed any tampering with the ballots. No one among the throng, except Mr. Stephenson, suggested even a suspicion of wrongdoing.

XIX Ariz.—18

The court admitted a conversation with Mr. H. H. Hart, the latter having been one of the election officers. This conversation is said to have occurred in Mr. Stephenson's office about·three months after the election in the middle of February, 1916, and was the result of a fear put into the heart of Hart by the Thiel detectives. In substance, it is to the effect that Hart told Stephenson that Pearson told Hart that Pearson had changed 47 ballots from Campbell to Hunt, but that he (Hart) had not seen any of such ballots changed. It is said that Hart stated in this conversation that he himself had changed a ballot that had been voted for Hunt to a vote for Campbell. Subsequently the court struck the evidence out as hearsay testimony, and properly so. The contestee has urged vehemently that neither Hart nor Pearson are worthy of belief in any particular, and yet it was insisted that the trial court admit and believe this purely hearsay testimony about ballots having been changed from Campbell to Hunt. Why the lower court was not compelled to observe the hearsay rule and reject this part of the testimony the argument of counsel leaves us absolutely in the dark. But it is urged in this court that it ought to be admitted and believed because it is an admission of Hart against his own interest. What interest? He is not a party to the contest. Certainly it is not against the interest of Hart to admit that another person told him of that person's perpetration of a criminal fraud in the corruption of an election. The only admission against Hart's interest is in the statement that he (Hart) had criminally changed a ballot which was a vote that belonged to Hunt to a ballot appearing to be a vote for Campbell. Such criminal conduct, if it took place, does not help the case of the contestee. The testimony of one Manatt, who said he happened to be in a room adjoining the room where the alleged conversation between Stephenson and Hart occurred, was to the effect that he (Manatt) heard Hart say to Stephenson that he (Hart) had been bothered by detectives, and wanted to tell all he knew about Douglas No. 1; that Hart said that one vote had been changed by himself from Hunt to Campbell; that Hart also said to Stephenson that Pearson had said to Hart that he (Pearson) had made changes in 47 votes from Campbell to Hunt. The court struck this testimony out because all the witnesses had been placed under the rule so that each witness could not obtain

knowledge of the testimony of any other witness, and it was shown that Manatt had talked to Stephenson regarding Stephenson's testimony and had read the transcript which contained the substance of Stephenson's testimony. However contemptuous of the court's rule this conduct of Manatt may have been, and whether the court was justified on this ground in excluding the testimony of the witness regarding votes being changed from Campbell to Hunt, it is not necessary to determine. Except as to the testimony concerning the confession of Hart's own criminal conduct in changing a ballot from Hunt to Campbell, the testimony is rank hearsay and incompetent as against contestant, and should have been rejected on that ground. There is a mass of testimony in the record growing out of intrigues and conversations the result of associations Hart had with the Thiel detectives, and particularly regarding these conversations occurring in a room in the Gadsden Hotel, in Douglas, at which Hart and a Thiel detective were present with some eavesdroppers stationed in an adjoining room. But, in view of the alleged admissions of Hart to Stephenson being purely hearsay as against the contestant, this testimony has no probative force. Its only effect is to impeach the testimony of Hart that he made no admissions of wrongdoing to Stephenson.

We have given the most painstaking attention to the record involving Douglas precinct No. 1, and viewed it from every angle, and it is clear to our minds that the trial court had nothing upon which to base its ruling in taking the 42 votes from Hunt and giving them to Campbell other than the mutilated ballots themselves.

"When a recount is demanded and made, if the box appears to have been opened since its delivery to the clerk by the officers of the election, or if the ballots show evidence of having been tampered with, the court should reject them, and accept the certificate of the officers of the election as the correct vote in the precinct." *Browning* v. *Lovitt,* 139 Ky. 487, 94 S. W. 662.

And said the Kansas supreme court in the case of *Spidle* v. *McCracken,* 45 Kan. 356, 25 Pac. 897:

"It has also been held by this court in the case of *Dorey* v. *Lynn,* 31 Kan. 758, 760, 3 Pac. 557, and in other cases, that, whenever the ballots cast at an election can be properly identified, they are the best evidence, and much better and more

reliable than a mere abstract or summary of the same made by the election officers; but whenever it is shown that they have wrongfully been tampered with, as has been shown in the present case, they lose their controlling character as evidence. *Hudson* v. *Solomon*, 19 Kan. 177, 187; *Cogland* v. *Beard* [65 Cal. 58], 2 Pac. 737. And where there is nothing else than discredited ballots to contradict the returns, the returns will be held to be conclusive."

The returns of the election board are *prima facie* evidence of the number of votes cast for contestant. To destroy the credit of the official returns there must be positive and unequivocal evidence of the fraud, and if the circumstances of a case can be explained upon the hypothesis of good faith, that explanation will prevail.

The all-important question of how and when and where and by whom was this mutilation of ballots accomplished remains unanswered. Counsel for contestee can throw no light upon the matter, but to assume it was fraudulently done and demand the alleged wrong be righted. Except the mutilated ballots themselves, the record they present to this court is silent about the matter. It is answered only by theories of counsel for contestant and contestee, which are as wide apart as the poles.

It is said in the brief for contestee:

"It was and is the theory of appellee that during the counting of the ballots as many as 42 ballots were fraudulently changed by erasing the cross in the square at the right of the name of appellee or the cross in the square at the head of the Republican column and inserting in pencil a cross either in the square at the head of the Democratic column or in the square opposite the name of appellant."

It is said in the brief for contestant:

"It is not for the appellant to furnish hypothesis, but we do repeat that it is far more likely that some designing person, subsequent to the making of the returns, sought by this crude method to bring into disrepute a precinct in which, as the evidence shows, the appellant received a large majority."

When we take into consideration the *prima facie* case made by the official returns together with the observations made by the Arizona supreme court, in *Oakes* v. *Finley*, 5 Ariz. 390, 53 Pac. 173, to wit:

"The temptation to actual fraud and corruption on the part of the candidates and their political supporters is never so great as when it is known precisely how many votes it will take to change the result; and men who are willing to sell their votes before election will quite as readily sell their testimony afterward, especially as the means of detecting perjury and falsehood are not always at hand until after the wrong sought to be accomplished by it has become successful and the honest will of the people has been thwarted"—who can say that the hypothesis of contestant is the less appealing of the two.

The principles announced in *Oakes* v. *Finley* are controlling here, and, tested by the rules there laid down, the action of the trial court in taking these 42 votes from Hunt and adding them to the vote of Campbell was error. Therefore 42 votes are added to the total for Hunt, and 42 are subtracted from the total for Campbell.

Contestant urges that the court erred in counting Wilgus precinct in Cochise county, giving contestant 6 votes and contestee 14 votes. The votes of this precinct were never canvassed by the board of supervisors of Cochise county, but in the returns of the board it was certified that the precinct of Wilgus was missing. There was no substantial compliance with the statute relative to the preservation of these ballots. They were not transmitted through the regular channels. They were not otherwise identified. About the only proof offered as to their authenticity was the admitted fact that an election was held in Wilgus precinct. The ballots were never delivered to the board of supervisors of Cochise county. Mr. A. C. Karger, the clerk of the board, testified:

"I didn't see the package containing the ballots from Wilgus precinct. I went out and looked for it. I have no personal knowledge whatever with respect to that package of ballots from Wilgus, and never saw it at all."

He further testified that neither he nor any member of the board of supervisors had Wilgus precinct before them at any time or at all.

Mr. Harry S. Ross, the county treasurer, testified:

"I found the package from Wilgus precinct under my counter on the day that I packed the ballots to bring them to this court. I don't know who put the package under my desk or how they got there. All the packages received by me from

the clerk of the board of supervisors were checked, and Wilgus was not then amongst them, and got into my office in some way unknown to me. I don't know how long the package had been in my office. Wilgus precinct was not in the list of packages turned over by the clerk of the board. This list was made up by the clerk of the board of supervisors and by a representative of both the Republican and Democratic parties, who excepted Wilgus precinct because it did not appear.''

Without some proof of their identity and integrity, it would be a dangerous precedent, indeed, to allow the returns of an election to be augmented by such character of ballots.

The contestee seeks to draw a parallel between this precinct and that of Camp 10, or Saginaw, in Coconino county. There is no similarity whatever. In Camp 10 the election officers·canvassed the votes. They were certified and delivered by them to the clerk of the board of supervisors. The board of supervisors canvassed the returns, certified to them, and ·delivered the same to the county treasurer. Here the ballots were preserved as directed by the law, and their identity and integrity was therefore established. The Civil Code pertaining to the canvass of returns provides as follows:

''3003. The board of supervisors of the county must meet at its usual place of meeting on the second Monday after each election to canvass the returns.

''3004. If, at the time of meeting, the returns from each precinct in the county in which the polls were opened have been received, the board must then and there proceed to canvass the returns, but if all the returns have not been received, the canvass must be postponed from day to day until all of the returns are received, or until six postponements have been had.''

It appears that the board met on the second Monday after the election and canvassed the returns from the precincts that had been received by them, but entered upon its minutes an order of adjournment before the expiration of the six-day period without canvassing the returns from Camp 10, which had been duly received within the time the board is · required to be in session to make the canvass. The board reconvened within the six-day period and duly canvassed the returns. It is clear from the statute that the attempted adjournment of the board is of no effect whatever. Until the

returns of all the precincts have been received, the canvass is, by operation of law, postponed from day to day until all of the returns are received, or until six postponements have been had. The board did nothing here but what the law compelled it to do. When these returns were received within the required time, if the board had neglected or refused to perform its plain duty, *mandamus* would issue to compel it to do so, and if the board had adjourned prior to the time fixed by the law, the writ would issue to compel the board of canvassers to reassemble and perform its duty. 9 R. C. L., Elections, § 115.

The court erred in augmenting the returns by counting the ballots purporting to be from Wilgus. This will subtract 6 votes from the total for contestant and 14 votes from the total for contestee.

Before considering special groups of ballots, upon which the assignments of error bear, it is necessary to a clear understanding of the matter that certain pertinent provisions of the statute pertaining to the official ballots and the duties prescribed for an elector to indicate his choice of candidates be quoted.

''2929. All proposed constitutional amendments or other propositions or questions to be submitted to the voters shall be printed at the bottom of the ballot, in such order as the secretary of state may designate, and each such amendment, proposition or question shall be followed by the words 'Yes' and 'No' or 'For —' and 'Against —' as the nature of the amendment, proposition or question may require, and at the right of and opposite each of such words shall be placed a square of the size of those placed opposite the names of candidates, in which the voter may indicate his vote for or against such amendment, proposition, or question, by a mark (X).''

Section 2932 gives the form of the official ballot.

''2940. Any person desiring to vote for all the candidates of any political party may do so by placing a cross in the square at the top of the column under the name of such party, otherwise he may vote for any candidate by placing his cross in the square opposite the name of such candidate.''

Section 2941 provides for the notice to voters, and contains this provision:

"If you do not wish to vote a straight ticket, put an 'X' in the square after the name of each candidate that you wish to vote for."

Section 2943 in subdivisions (2) and (3) provides:

"(2) The voter will then repair to a booth provided for that purpose, and there mark or stamp his ballot. If he wishes to vote a straight ticket he may place a cross in the square at the top of the column under the name of the party and for whose candidate he wishes to vote, otherwise he will mark his ballot with an 'X' in the square opposite the name of each candidate whose name is printed on the ballot for whom he desires to vote.

"(3) If the voter desires to vote for any person whose name is not printed on the ballot, he will write the name of such person on the blank lines immediately below the names of all the candidates printed on the ballot for the particular office for which he desires to vote for such person, and mark the same with an 'X' in the square opposite such blank line."

"2955. On receiving his ballot the voter shall forthwith and without leaving the polling place or going outside of said guardrail, retire alone to one of the booths or compartments not occupied by any other person, and prepare his ballot by placing a cross (X) opposite the name of the candidate of his choice for each office to be filled, or by filling in the name of the candidate of his choice in the blank space provided therefor and marking a cross opposite thereto; and in case of a question submitted to the vote of the people, by marking in the appropriate margin or space a cross (X) opposite the answer which he desires to give. Before leaving the booth or compartment, the voter shall fold his ballot lengthwise and crosswise, but in such a way that the contents of the ballot shall be concealed and the stub can be removed without exposing any of the contents of the ballot, and shall keep the same folded until he has delivered the same to the inspector as in this section provided. After the ballot is so folded and so delivered to the inspector, or judge acting as such, the inspector or judge shall receive the ballot and before depositing it in the ballot box must, in an audible tone of voice, announce the name and stub number of the ballot of the person voting, and such inspector shall, in the presence of the election board, thereupon remove the stub without opening the ballot and deposit the ballot in the ballot box, and string

the stub upon a string to be provided for that purpose. The voter shall then proceed outside the guardrail by the exit thereof, and shall not again enter such enclosed space during such poll unless he is an election officer. No voter shall be allowed to occupy a voting booth or compartment for more than five minutes when other voters are waiting to occupy the same. No inspector shall receive any ballot from any voter unless the stub remains attached to the ballot.''

Counsel for the contestee argue that it is the duty of the election officers and of the court, under these statutes, to carry out the intention of the voter, and if it can be ascertained from an inspection of the ballots for whom the elector intended to vote, regardless of the manner in which the ballot is marked to express the choice of the elector, the provisions of the statute relating to the manner in which the elector shall express his intention should be construed as directory only. Counsel for contestant, on the other hand, contend that this is the correct course to pursue only to a certain extent; that, as the legislature has required the elector to do certain things to express his intention there must be a substantial compliance upon his part with these legislative instructions in order to ascertain that intention; that if the intention of the voter is to be carried out other than by a substantial compliance with the law governing the marking of his ballot, then his choice will be ascertained by the uncertain and undefined ideas of election boards and judges, and not any clearly expressed intention of the voter.

In McCrary on Elections, section 724 (fourth edition), it is said:

''The decisions cited in the preceding sections upon the question whether the provisions of the law are mandatory or directory are not entirely harmonious. They, however, disclose a well-defined disposition on the part of the courts to distinguish between acts to be performed by the voters and those devolving upon the public officials charged with the conduct of the election. The weight of authority is clearly in favor of holding the voter, on the one hand, to a strict performance of those things which the law requires of him, and, on the other, of relieving him from the consequence of a failure on the part of election officers to perform their duties according to the letter of the statute, where such failure has not prevented a fair election. The justice of this rule is ap-

parent, and it may be said to be the underlying principle to be applied in determining this question. The requirements of the law upon the elector are in the interest of pure elections, and should be complied with at least in substance, but to disfranchise the voter because of the mistakes or omissions of election officers would be to put him entirely at the mercy of political manipulators. The performance by the election officers of the duties imposed upon them can be reasonably well secured by providing a penalty for failure so to do."

The rule requiring the voter to express his choice substantially in the manner provided by the statute is the safest guide and the better rule deducible from the authorities. *Howser v. Pepper,* 8 N. D. 484, 79 N. W. 1018; *Van Winkle v. Crabtree,* 34 Or. 462, 55 Pac. 831, 56 Pac. 74; *Carwile v. Jones,* 38 Mont. 590, 101 Pac. 153; *Tebbe v. Smith,* 108 Cal. 101, 49 Am. St. Rep. 68, 29 L. R. A. 673, 41 Pac. 454.

If the voter is not held to a substantial compliance with the directions of the statute in the expression of his choice of candidates, the spirit of the Australian ballot system is ignored. We might as well return to the old system of haphazard voting in vogue before this innovation, and to remedy the many evils of which, the new system was inaugurated. Under the old system there was an utter absence of statutory rules regulating the ballot and the manner of expressing the voter's choice upon that ballot. The courts were thus driven to adopt the "rule of intention" which inevitably permitted the judges to follow "any chimerical notions in giving effect to that frequently visionary and uncertain quantity known as the voter's intention." This rule of intention, unless it be bridled and bitted, is a stealthy invitation to the judges to express the voter's choice, rather than by well-defined rules of law letting the elector do it himself.

By the laws of Arizona educational qualifications are a prerequisite to the exercise of the suffrage. One too illiterate to mark his ballot substantially as the statute directs cannot for that reason be assisted. Any officer of the election or other person who obtrudes upon the voter's secrecy is visited with a penalty, unless it be that occasion on which the law authorizes it, namely, when the voter is physically disabled from marking his ballot, and in this instance the voter's secrecy must not be obtruded upon except by those named in the statute and in the manner the statute prescribes. The

statute is particular to specify the form of disability as physical.  Paragraph 2958, Civil Code 1913.

Said the court in *Van Winkle* v. *Crabtree,* 34 Or. 462, 55 Pac. 831, 56 Pac. 74:

"Every elector who performs the act of voting is presumed to know the law of his state, applicable to the exercise of the right of suffrage; and, if he fails to comply with its provisions, his mistake or ignorance deprives him of the benefit to be derived from the practice of such right.  This being so, his right to have his choice declared as he intended must depend upon his compliance with the law applicable thereto in force on the day of the election.  While the Australian ballot system is designed to purify elections by securing to the voter the prerogative of freely and privately selecting the candidates of his own choice, the law is also well calculated to promote the cause of general education, by compelling the masses to learn to read and write as a condition precedent to the exercise of the right of suffrage. . . .

"To give effect to this latter purpose of the law, which is almost as important as its primary object, the statute should receive a reasonably strict construction."

Having these statutes before us, if we look at the prescribed form of the ballot in connection therewith, it must appear to any fair mind open to conviction that the law provides a separate column within vertical lines on the official ballot for each political party; that the names of all candidates of a particular party, except judges and members of the tax commission, shall appear within the column set apart for that political party; that after the name of each candidate within the column a dotted line shall be run to a square placed within such column opposite the name of the candidate, and it is in this square photographed in the statutory form of the official ballot, and by plain mandate of the statute, that the elector must mark his choice of candidates if the elector does not wish to vote a straight ticket by marking a cross in the square at the top of the column under the name of the party, and in addition also marking a cross in the squares opposite the names of judicial candidates and members of the tax commission.

It is clear from the form of the official ballot and the statutory expressions, "and at the right of and opposite each of such words shall be placed a square of the size of those placed

opposite the names of candidates,'' as in paragraph 2929, or ''otherwise he may vote for any candidate by placing his cross in the square opposite the name of each candidate,'' as in paragraph 2940, or, ''If you do not wish to vote a straight ticket, put an 'X' in the square after the name of each candidate that you wish to vote for,'' the place appropriated for expressing the voter's choice is in the square following the dotted line after the candidate's name, which square is at the right of and opposite the name of the candidate and within the lines of the particular party column. This language is not only unambiguous, but in addition the statute makes a photograph of the ballot for the benefit of those who might otherwise misunderstand it.

With these principles in mind, the assignments of error calling in question rulings of the trial court with respect to certain groups of ballots will be considered.

An examination of the ballots and rulings of the trial court discloses that 23 ballots were counted for Campbell on which the voter marked a cross in the square within the lines of the Prohibition column opposite the dotted lines where the name of the Prohibition candidate for Governor, if any, should appear. The name of nò candidate for the office of Governor on the Prohibition ticket was printed upon the ballot. It is clear that the ruling of the court cannot be sustained. The ballot was not marked as the statute required; neither does the manner of marking express any intention to vote for Campbell. The Prohibition party nominated a candidate for Governor, but for some reason his name was not printed upon the official ballot. If I were groping for the intention of the voter in these instances, I would conclude that he intended to vote for the candidate of the Prohibition party or his choice of members of that party, but forgot to write his name in the blank space. He did everything the statute requires to vote thus except write in the name. He did nothing the statute requires to vote for either Hunt or Campbell. The square in which the mark is placed is opposite and to the right of the name of Hunt. It is opposite and to the left of the name of Campbell. There is an intervening space between the square in which a vote could be marked for Hunt, and this square marked in the Prohibition column. There is also an intervening space between the square in which a vote could be marked for Campbell and this square marked in the Prohibi-

tion column. The mark appears, however, much nearer the name of Campbell than it does to the name of Hunt. It is a severe strain on even the "intention rule" to say that a voter who places his cross in a separate and distinct square located in a separate and distinct column, devoted to the candidates of a separate and distinct political party, shall be concluded to have voted for the candidate whose name appears the nearer thereto. In *Apple* v. *Bancroft*, 158 Ill. 649, 41 N. E. 1116, the court said:

"Ballot No. 2 shows a cross, thus, (X), not in the square or appropriate place opposite the name of appellant, but to the right of appellant's name, between such name and the square opposite the name of appellee. While there was some plausibility in the contention of appellant that the way in which this ballot was marked showed that it was the intention of the voter to vote for appellant, still, as was held in the case of *Parker* v. *Orr* (decided at the present term of this court), [158 Ill. 609] 41 N. E. 1002 [30 L. R. A. 227], it cannot be held a sufficient compliance with the statute. It is clear from the statute and the form of ballots prescribed that the appropriate place for the cross is in the circle or square preceding the title or name, *and not some blank space discovered by the voter at the right of such title or name.* [Italics ours.] As to the ballot in question, as the cross is between the names of appellant and appellee, being at the right of the former, and at the left of the latter, the only reason for supposing that the elector intended to vote for appellant, rather than for appellee, is that the cross is nearer appellant's than appellee's name."

On many of the ballots examined the Republican column is printed on the ballot parallel with and directly next to the Democratic column. On such ballots the appropriate square in which to mark a cross as a vote for Hunt is after the name of Hunt and to the right thereof and opposite thereto and in the Democratic column, but nevertheless the cross is more than two inches nearer the name of Campbell than to the name of Hunt. To my mind it is not more absurd to contend that the voter here intended to vote for Campbell because the cross in the square opposite the name of Hunt is also opposite the name of Campbell, but is two inches removed from the name of Hunt, whereas it is only a quarter of an inch removed from the name of Campbell. The decisive an-

swer to it is that a ballot so marked for Hunt is, by statutory direction, the appropriate place to mark it for him. These 23 ballots are to be deducted from the total vote counted for Campbell.

Contestee claims that the court erred in counting for contestant ballots marked with a cross in the square at the top of the Democratic party column with a separate cross in the square after the names of other Democratic party candidates, but with no cross in the square after the name of appellant.

In the trial court this class of ballots was called straight party and split for Governor ballots. Paragraphs 2940 and 2941 of the Civil Code authorize and invite the voting of a straight party ticket, except for judges and members of the tax commission, by placing a cross in the square at the top of the column under the name of such party, or that the elector may vote for any candidate by placing his cross in the square opposite the name of such candidate.

Civil Code of 1913 also provides:

"2959. If the voter marks more names than there are persons to be elected to an office, or if for any reason it is impossible to determine the voter's choice for any office to be filled, his ballot shall not be counted for such office. No ballots without the official indorsement shall, except as herein otherwise provided, be allowed to be deposited in the ballot box, and none but ballots provided in accordance with the provisions of this title shall be counted. Ballots not counted shall be marked defective on the backs thereof, and be preserved and returned to the board of supervisors or recorder or clerk from whom received as hereinbefore provided."

"2979. If the names of more persons are designated on any ballot found in the ballot box for the same office than are to be chosen for such office, then, except in the cases provided for in the next section, all the names designated for such offices must be rejected, and the fact of such rejection, and the reason therefor, must, at the time of such rejection, be voted on the ballot and signed by a majority of the election board."

It is manifest that this method of marking the ballot is not prevented by the provisions of the two paragraphs of the statute last quoted. The Oklahoma supreme court, in construing a statute similar to ours, in its instructions to the

voter as to the method of voting a straight party ticket, or for individual candidates, said:

"To our minds it seems clear that under this statute a stamp in the circle at the head of the list of candidates is the statutory method provided whereby a voter may manifest his intention to vote for every candidate under that stamp. If this is true, and, after having placed the stamp there, the voter has succeeded in voting for all of these candidates, then the placing of additional stamps in front of the different names on that same list would either constitute distinguishing marks or be without any effect whatsoever. . . . We conclude they are without effect." *Potts* v. *Folsom,* 24 Okl. 731, 28 L. R. A. (N. S.) 460, 104 Pac. 353.

In *Spurrier* v. *McLennan,* 115 Iowa, 461, 88 N. W. 1062, the supreme court of Iowa, quoting from Robinson, J., in the case of *Whittam* v. *Zahorik,* 91 Iowa, 23, 51 Am. St. Rep. 317, 59 N. W. 57, said:

" 'Hence, when a voter has marked his ticket by placing a cross in the circle opposite the title, he does not add to the legal effect of that marking by placing crosses in squares opposite the names of candidates on the same ticket.' This, we think, is true under the present statute. And we may say, further, that crosses in squares under such circumstances not only do not add to the effect of the mark in the circle, but they do not detract from it; they have no consequence whatever."

To the same effect is the case of *State ex rel. Brooks* v. *Fransham,* 19 Mont. 273, 48 Pac. 1. The trial court's ruling is correct.

The trial court did not err in ruling that ballots having a cross in the square at the top of the Democratic party column and a cross in the square after the name of appellee in the Republican column should not be counted either for contestant or contestee. This method of marking a ballot is in direct violation of the statute, being a vote for two opposing candidates for the same office. The statute penalizes the voter for thus marking his ballot by forbidding it to be counted for the office. Paragraphs 2959 and 2979, Civil Code 1913.

"As we have said, the circle mark being of equal significance with the cross mark opposite the name, the corollary of that, and the equivalent statement that the voter has distinctly expressed his intent to vote for two men, is that, so

far as that part of the ballot is involved, it becomes impossible to determine the elector's choice, and such a vote or votes must not be counted for either candidate." *State ex rel. Brooks* v. *Fransham,* 19 Mont. 273, 48 Pac. 1.

"A cross in the circle conclusively means a vote for the whole ticket printed below it, and a mark in the square before a name on another ticket has no effect other than to nullify the vote for the officer thus doubly voted for." *Spurrier* v. *McLennan,* 115 Iowa, 461, 88 N. W. 1062.

See, also, *Heiskell* v. *Landrum,* 23 Colo. 65, 46 Pac. 120; *Day* v. *Dunning,* 127 Cal. 55, 59 Pac. 196; *Dickerman* v. *Gelsthorpe,* 19 Mont. 249, 47 Pac. 999.

Ballots having a cross in the square at the top of the Democratic column and a cross in the square at the top of the Prohibition column in those counties wherein no name was printed upon the ballot as a candidate for Governor were counted for Hunt. Likewise such ballots where the cross was at the top of the Republican and Prohibition columns respectively were counted for Campbell. The ruling is correct. *Caldwell* v. *McElvain,* 184 Ill. 552, 56 N. E. 1012. Likewise the ruling of the court is approved where votes were counted for contestant and contestee respectively where ballots have a cross in the square at the top of the Prohibition column and a cross in the square after either the name of contestant or contestee where no name as a candidate for Governor on the Prohibition ticket was printed upon the ballot. *Spurrier* v. *McLennan,* 115 Iowa, 461, 88 N. W. 1062; *Parker* v. *Orr,* 158 Ill. 609, 30 L. R. A. 227, 41 N. E. 1002.

It is argued that the court was justified in counting as votes for Campbell those ballots having his name written in on a blank line, but no mark in the square opposite his name either as printed upon the ballot or so written thereon. Tested by the statute, the ruling is clearly wrong. Paragraph 2932 of the Civil Code of 1913 provides:

"In each column at the right of the name of the candidate and on the same line there shall be a space so inclosed by rule work as to make a square three-eighths of an inch in size, in which a voter may designate his choice by a cross-mark. Below the name of the last named candidate for each office in each column, shall be placed as many blank lines as there are offices of the kind to be filled, and in like manner a square shall be placed after such blank space. Upon such blank lines

the voter may write the names of any person or persons for whom he desires to vote whose names are not printed, and in the squares opposite the same, he shall designate his choice by a cross-mark as in the case of printed names.''

This statute is plain to the effect that the voter cannot express his choice by merely writing in a name upon the blank space left for that purpose. When the name of his choice is not printed upon the ballot, he may write in that name and mark his ballot in the square opposite the name so written in. The two statutory acts, to wit, writing the name and marking in the square opposite thereto, are essential to express the voter's choice. The two acts must concur. See *Riley* v. *Trainor,* 57 Colo. 155, 140 Pac. 469; *Martin* v. *Miles,* 46 Neb. 772, 65 N. W. 889; *McKittrick* v. *Pardee,* 8 S. D. 39, 65 N. W. 23; *Carwile* v. *Jones,* 38 Mont. 590, 101 Pac. 153. These five votes counted for the contestee must therefore be deducted from the total vote counted for him.

The contestee makes objection to the counting of certain ballots hereinafter specifically enumerated wherein it is contended that the court erred in counting the same for contestant or contestee, as the case may be, because on such ballots the voter attempted to express his choice of candidates for the office of Governor in marking his ballot otherwise than with a cross.

It is obvious from a consideration of these statutes bearing upon the Australian ballot system that, while it is mandatory upon the voter to express his choice of candidates in the appropriate place set apart therefor, that is to say, in the proper column and after and to the right of and in the square opposite the name of the person voted for, the provisions of the statute are equally plain as regards the kind of a mark required of the elector to indicate or give expression to his choice. The mark specified in the statute is a cross. But while these provisions as to the marking of ballots are in their nature mandatory, they tend to limit the citizen in his exercise of the right of suffrage, and should be liberally construed in his favor. *Bowers* v. *Smith,* 111 Mo. 45, 33 Am. St. Rep. 491, 16 L. R. A. 754, 20 S. W. 101. It is not at all considered that the elector is required to mark a perfect cross nor place the same exactly within the square. The statute in some parts merely says a cross and in other parts make a mark, illustrated by the figure X. St. Andrew's cross is made

XIX Ariz.—19

in the form of an X. There are three other principal forms of the cross: The Latin cross ✝, used in the crucifixion of our Savior, and a symbol of the Christian faith; St. Anthony's cross is made in the form of a T; the Greek cross, ✚. A cross also in the form of a Y is used as a bearing in certain departments of applied science. Thus, says the Century Dictionary: A cross may be in many varieties of form or size. It may be aiguise, anchored, annulate, bottony, humette, etc. The many variations of the cross all have been and should be held to be a substantial compliance with the statute. If the legislature had desired explicitly to restrict the voter to the marking of any particular kind of a cross, it would have made the simple provision that any ballot not marked with that particular kind shall be rejected. Of course, it is not meant to say that, if a variation of the cross X, as illustrated in the statute, is shown by a series and symmetry of ballots, or evidence sufficient to show that they were so marked and intended to designate or impart knowledge of the persons who voted such ballots, it would be approved. A cross may be so made as under the circumstances it would constitute a distinguishing mark such as the statute denounces. We are here speaking of those cases where the marking, though a variation, is not shown to be the result of evil purpose. It is enough if the voter manifests a *bona fide* effort to make a cross and mark it substantially within the square. Said the supreme court of Minnesota in the case of *Pennington* v. *Hare,* 60 Minn. 146, 62 N. W. 116:

"The statute does not, however, prescribe any inflexible rule as to what shall or shall not be accepted as a cross-mark, and any mark, however crude and imperfect in form, if it is apparent that it was honestly intended as a cross-mark, and for nothing else, must be given effect as such; otherwise, electors unaccustomed to the use of pen or pencil might be disfranchised."

Thus we have a simple and symmetrical rule, and one that is not at all burdensome upon the elector, and one that is clearly within the spirit as well as the letter of the statute, and nothing is urged in opposition to it by counsel for contestant. It is not difficult for one of even the most limited intelligence to substantially follow its requirements. A voter with the most limited intelligence will experience no difficulty whatever in marking the simple cross X indicated in the stat-

ute. This is the very best emphasis the voter can give to express his choice, and with this simple act the intelligent voter will be content. No one will contend that an elector who willfully and with apparent obstinacy refuses to comply with the statute, when its great object is to promote the purity of elections, the uniformity in voting, and for his own benefit in preserving the independence of the voter, should receive undue consideration; and this very thing is clearly indicated in some of the ballots called in question under this assignment, where the elector marked a cross in expressing his choice for other candidates and amendments and measures submitted, but made no attempt whatever to make a cross to express his choice of candidates for Governor.

The exhibits in question under this assignment are as follows, to wit: 149, 431, 228, 102, 575, 503, 110, 64, 517, 215, 226, 229, 369 and A–542, 590, 370, 422, 516, 83, 520, 521, 517, 268, 361, 556, 630, 540, 405, which ballots contestee asserts were counted for Hunt; and Exhibits 319, 703, 532, 148, 601, 655, 688, 479, 643, and A–394, 596, 230, 499, 598, counted for Campbell.

Exhibit 149, the voter wrote ''Yes'' in the square opposite Hunt's name and over the word marked a cross. It is not contended that the ballot itself or any evidence *aliunde* shows that the voter so marked it for the purpose of distinguishing his vote. In putting both the cross and the word ''Yes'' in the square, it is evident the voter merely wished to emphasize his choice for Governor.. It was properly counted for Hunt.

Exhibit 431, the voter merely wrote the word ''Yes'' in the square opposite Hunt's name. This ballot should not be counted for Hunt. Exhibits 228, 575, 503, A–516, A–83, A–520, and A–521 are similar, and should not be counted for Hunt. Exhibit 102 was properly marked with a cross in the square opposite Hunt's name, and was properly counted for him. A–542, the only expression of the voter's choice was by writing the word ''Yes'' in the square at the top of the Democratic column. This ballot should have been rejected, and was improperly counted for Hunt. Exhibits A–590 and A–370, the word ''Yes'' was written after the name of Hunt, but there was no mark within the square opposite his name. These ballots should not have been counted for Hunt.

A–422, the cross was placed within the square opposite the name of Hunt, but the word ''Yes'' was also written on the

dotted lines after his name. It is not contended that the evidence discloses this to be intended as a distinguishing mark, and the ballot was properly counted for Hunt.

Exhibit 110 is marked in the square opposite Hunt's name thus ☒ with just the faintest intersection of the lines. The ballot shows an honest effort to mark a cross, and it should be counted for Hunt.

Exhibit A–517, the ballot was marked with a vertical line in the square at the top of the Democratic column. There was no mark after the name of any candidate for Governor, but the elector did express his choice for a number of candidates for other offices by marking a cross in the square opposite their names. This is an instance where, if the elector intended to express a choice for Governor, he willfully disobeyed the statute, and his ballot cannot be counted for that office. Exhibits 64 and 517, the voter marked his ballot in the square at the top of the Democratic column thus: in 64, ◹ ; and in 517, ◿ ; also the latter ballot was marked in the square opposite Hunt's name ◺. There is indicated no honest effort to mark a cross, but the elector evinces a willful disregard of the statute. These two ballots should not be counted for Hunt. Exhibit 215 is marked with a cross in the square opposite Hunt's name, and was properly counted for him. Exhibit 226 has a cross marked in the square at the top of the Republican column with a cross also marked in the square opposite the name of Hunt. A line was also drawn through the name of Campbell. The court properly refused to count this ballot for either contestant or contestee. Exhibit 229 has a cross in the square at top of Democratic column and a cross marked in the square after name of Campbell. This was not counted for either party, and properly so. Exhibit A–268 has a cross in the square at top of Democratic column, and was properly counted for Hunt. A–361 has a cross marked in square at top of Democratic column, also crosses in the squares at top of Independent and Prohibition columns. No candidate's name was printed upon either the Independent or Prohibition tickets for Governor. This ballot was properly counted for Hunt. A–556, a cross was placed in the square at top of Republican column; also a cross was marked in the square opposite the name of Hunt. This ballot was properly not counted for either Hunt or Campbell.

A–630, a cross is marked in the square at the top of the Democratic column, but the lines of the cross extend somewhat beyond the lower line of the square. It is not contended this is a distinguishing mark, and it is clear the elector made an honest effort to comply with the law in marking his ballot. This ballot was properly counted for Hunt.

A–540, a cross is marked within the square at the top of the Democratic column. It is evident the voter was suffering with the palsy or unsteady hands from the imperfect cross made, but it evinces an honest effort to comply with the law and was properly counted for Hunt. A–405 has a cross within the square at the top of the Democratic column, but from the appearance of it the same observations made with reference to Exhibit A–540 are applicable. It was properly counted for Hunt.

Exhibits 319, 703, A–394, and A–596 each has the word "Yes" written in the square opposite the name of Campbell, and such ballots were improperly counted for him. Exhibit 369 is a ballot marked with a cross in the square at the top of the Republican column, and was properly counted for Campbell.

Exhibit 532, a check mark thus $\boxed{\text{L}}$ is made in the square opposite the name of Campbell. No attempt was made to mark a cross, and the ballot was improperly counted for Campbell.

Exhibit 148, on this ballot the figure $\boxed{1}$ was marked in the square opposite the name of Campbell. In expressing his choice for many of the candidates the elector marked an excellent cross within the appropriate square. It is evident that, if the voter did intend to vote for Campbell, he willfully disregarded the statute, and his ballot cannot be counted for the office. It was error to count it for Campbell. Exhibits 601 and 628, on these ballots, lines were drawn across the squares diagonally thus $\boxed{\diagdown}$. These ballots should not have been counted for Campbell.

Exhibits 655 and A–598, the elector marked the appropriate square with a cross, but made more lines than necessary. It is not contended this was done to distinguish the ballots. These two ballots were properly counted for Campbell. Exhibits 479 and 643, on these ballots the elector complied with the statute in marking his choice of other candidates or the measures submitted, but made no attempt to mark a cross

after the name of Campbell.   The squares opposite the name
of Campbell were marked with the figure ⊡ , and cannot
be counted as votes for him.   A–230, here also the elector
marked a cross to express his choice in other instances, but
made no attempt to mark a cross after the name of Camp-
bell, and it was improperly counted for Campbell.   A–499 is
merely a check mark ⟦√⟧, no attempt being made to mark a
cross.   Improperly counted for Campbell.

From the foregoing it is found that of these exhibits 14
of the ballots were improperly counted for Hunt and 12 of
them improperly counted for Campbell.   Fourteen votes are
therefore deducted from the total vote counted for Hunt and
12 votes from the total vote counted for Campbell.

It is urged by contestee that the trial court erred in count-
ing votes for contestant and contestee respectively where the
cross was marked in the square opposite the dotted lines left
blank for the purpose of enabling the voter to express his
choice by writing in the name in those cases where the name
of the voter's choice was not printed upon the ballot.   No
name was written upon the dotted line.   In these instances
the cross was in the square underneath the square opposite
either the name of Hunt or Campbell.   It is asserted under
this objection that Exhibits 734, 90, 411, 418, 152, 165, 305,
433, 632, 253, 353, 606, 732, and A–386 were counted for
Hunt and Exhibits 49, 80, 86, and A–350 were counted for
Campbell.   An examination of these exhibits and the record
discloses that Exhibit 734 is not a ballot, but a tally sheet;
that Exhibits 90, 411, and 418 were not counted for Hunt,
but ruled to be no votes.   The other ballots so counted should
have been rejected.   The theory upon which they seem to
have been counted was that the elector was suffering with an
astigmatism,and thereby disabled from properly marking his
ballot.   There is no evidence whatever in the record about
this, but even so it is a physical disability, and the statute is
specific in pointing out the method by which a voter suffer-
ing the physical disability may be assisted in expressing his
choice.   The astigmatism theory is further weakened by the
ability of the elector to properly mark his ballot for candi-
dates other than Governor.   These ballots cannot be counted
for either party.   Here 10 votes must be deducted from the
total vote counted for Hunt, and 4 votes deducted from the
total vote counted for Campbell.

The counting of certain ballots is objected to by contestee on the ground that they bear distinguishing marks. Of these Exhibits, 126, 150, 206, 222, 238, 244, 245, 323, 332, 424, 477, 502, 584, 351, 623, 398, 312, and A–435 were counted for Hunt. Exhibits 742, 731, 718, 749, 493, 278, 115, A–359, A–360, and A–450 were counted for Campbell.

Civil Code of 1913 provides:

"2982. When a ballot found in any ballot box bears upon it any impression, device, or color, or thing, or is folded in a, manner intended to designate or impart knowledge of the person who voted such ballot, it must, with all its contents, be rejected.

"2983. Whenever the board of election rejects a ballot, it must, at the time of such rejection, cause to be made thereon and signed by a majority of the board an indorsement of such rejection and of the causes thereof.

"2984. All rejected ballots must be preserved and returned in the same manner as other ballots.

"2985. Whenever a question arises in the board as to the legality of a ballot, or any part thereof, and the board decide in favor of the legality, such action, together with a concise statement of the facts that give rise to the objection, must be indorsed upon the ballot and signed by a majority of the board."

It will be observed upon a consideration of section 2982 that it is not every mark found upon a ballot, if placed there without an evil purpose, or by accident or inadvertence, or perhaps by reason of a perverse idiosyncrasy of the particular elector, that will justify the rejection of a ballot, but it is a ballot found in the ballot-box being folded in a manner or bearing upon it a thing intended to designate or impart knowledge of the person who voted such ballot that is obnoxious to the statute. Except as to two of these exhibits, 332 and 502, which were rejected by the boards of election with a statement signed by a majority of the board that the ballots were found in the ballot-box bearing distinguishing marks, there is not a particle of evidence that any of the ballots had the marks now appearing upon them when they were found in the ballot-box by the respective boards of election. It seems clear to me that when a ballot is found in the ballot-box folded in a manner or bears upon it a thing intended to designate or impart knowledge of the person who voted such

ballot, it is the duty of the election board to make a concise statement of these matters signed by a majority of the board. If election officers would faithfully perform their duties under these statutes and make such records in the presence of bystanders at the time of counting, it would be an excellent means whereby to prevent tampering with the ballots after they are once counted.   Except the two ballots, there is no statement of the election board; neither is there a particle of evidence as to who put these things upon the ballot or when they were put there.   There is nothing except the ballots themselves upon which to base any judgment that they were intended to disclose knowledge of the persons who voted them.   The ballots are from widely separated precincts with no series of ballots, no system or symmetry in the marking of them, such as might disclose a purpose to violate the statute.   I think it would be a dangerous rule to condemn these ballots without some evidence at least that they bore the things upon them now urged for their condemnation when found in the ballot-box.   See *People* v. *Board of Supervisors,* 135 N. Y. 522, 32 N. E. 242.

Of the ballots identified as bearing marks upon them when found in the ballot-box: Exhibit 332 is where the voter marked his cross in the Democratic square at the top of the ballot, and then drew a line to the space where the names of the Democratic candidates for presidential electors are printed, and along this line wrote the word ''Wilson''; Exhibit 502, the voter marked a cross in the square at the top of the Democratic column, and in the square for voting on an initiative petition of the people, last printed upon the ballot, he drew a heavy oblique line extending it beyond the square about two inches, and then in large letters wrote ''I vote Yes,'' heavily underscored.   These two ballots should have been rejected.   They are identified as bearing these things upon them when found in the ballot-box, and such evidence is sufficient to show that the voter deliberately placed these unauthorized things upon the ballot.   As heretofore said, it is not every kind of a mark unauthorized by law that will justify the rejection of a ballot, but when the evidence discloses that the voter deliberately placed upon his ballot an unauthorized thing that may serve to impart to others knowledge of the person who voted such ballot, its consequence will be that the voter intended it so, and his ballot must be

rejected. See *Whittam* v. *Zahorik*, 91 Iowa, 23, 51 Am. St. Rep. 317, 59 N. W. 57. Two votes are here to be deducted from the total vote counted for Hunt.

It is a matter of pride to comment here upon the great intelligence with which the popular will is expressed in Arizona. There is perhaps no state in the Union that can approach Arizona in the number of voters whose intention is manifested by doing those things required by law to carry out such intention. Some 60,000 ballots have been scrutinized and overhauled as thoroughly perhaps as any ballots have ever received. With such skill and vigilance the number found subject to criticism is infinitesimal. Out of the whole number perhaps not more than 50 indicating perverse obstinacy or an idiosyncrasy of the voter. It may not be amiss here to say to those that may delight in expressing their choice of candidates idiosyncratically or by putting marks unauthorized by law upon their ballots that they thus place no emphasis upon the expression of their choice, but subject the ballot to criticism, and perhaps condemnation and rejection. That the elector can give greatest emphasis to the intention with which his choice is expressed by manifesting an honest effort to mark a cross substantially in the square appropriated for that purpose; the simple process of doing a plain thing prescribed by law, and which the least intelligent may readily grasp. To do less than this may not be enough but to do more is certainly a detraction from the things required to be done by the law.

The contestant urges that the court erred in not rejecting the ballots in the precincts of Pinedale and Snowflake. The provisions of the Arizona statutes and the facts of this case seem to place the precinct of Pinedale squarely within the rule laid down in the case of *Tebbe* v. *Smith*, 108 Cal. 101, 49 Am. St. Rep. 68, 29 L. R. A. 673, 41 Pac. 454. If the reasoning of that case is correct, then under the laws of Arizona Pinedale would have to be rejected. In Snowflake precinct the record discloses apparent and many irregularities in the conduct of the election and in the matter of election officers and others without authorization of law obtruding upon the secrecy of the voters and unlawfully assisting them in the preparation of their ballots. Whether the penalties of the law prescribed against such acts are to be considered a sufficient deterrent, or whether under the law it is mandatory

upon the courts to reject such precincts on account of such practices, I deem it unnecessary to determine. These precincts each gave Campbell a much greater number of votes than were given to Hunt, and whatever might be determined would not affect the final result of this case. If these precincts are counted, Campbell's total vote will not be affected. If they should be rejected, Hunt's total vote would be increased by a considerable number.

The contestee makes a number of assignments provisionally; that is, if this court rejects the precincts of Snowflake, then contestee urges the rejection of other precincts for the reason that the irregularities and misconduct on the part of the election officers shown by the evidence in the case of said precinct of Snowflake are shown by the evidence to have been in several other precincts. It being unnecessary to a decision of this case to consider the objections to Snowflake precinct, it follows that it is unnecessary to review these assignments. Two other assignments of error by contestee to the effect that "the court erred in overruling appellee's objection to the counting of ballots offered by contestant and proceeding to count the same without proof of their integrity," when taken in connection with the argument in support thereof, are so indefinite and uncertain that we are unable to determine just what the contention is. No part of the record is pointed out wherein the court erred in such particulars. With the exception of Wilgus precinct, it is not indicated wherein the finding of the court "that the respective boards of supervisors received such ballots in due course from the respective persons purporting to be the respective boards of election, and that the respective boards of supervisors transmitted to the respective county treasurers the ballots in the same condition in which they had been received by them, and that the ballots offered in evidence were received from such county treasurers in the same condition in which they had been received by the county treasurers," is not sustained by the evidence. Such facts are *prima facie* proof of the integrity of the ballots and sufficient to authorize their admission in evidence.

"Where the ballots are preserved in strict accordance with the statutory requirements, they are admissible in evidence without further proof." *Averyt* v. *Williams,* 8 Ariz. 355, 358, 76 Pac. 463.

See, also, *Wheeler* v. *Lawrence,* 78 Kan. 878, 99 Pac. 228; *Tebbe* v. *Smith,* 108 Cal. 101, 49 Am. St. Rep. 68, 29 L. R. A. 673, 41 Pac. 454; *Murphy* v. *Lentz,* 131 Iowa, 328, 108 N. W. 530.

In the matter of costs of the contest, it is ascertained from section 3069 of the Civil Code of 1913, that the compensation of the persons making an inspection of the ballots in preparation for the trial of the contest, as therein provided, shall be taxed against the defeated party. This is the only provision of the statute with reference to the taxation of costs against the defeated party in an election contest. It is only by special statute in an election contest that the prevailing party may be allowed judgment for costs.

"The court has no authority to give judgment for costs in a contested election case, unless there is a statute expressly authorizing it." 15 Cyc. 440.

The text of Cyc. is sustained by the adjudicated cases. The costs awarded the prevailing party must therefore be limited as specified in the statute. The judgment is appealable, however, and the prevailing party under the statute is entitled to his costs in this court.

I have taken an infinite delight in exploring the record presented for the consideration of this court. It has been altogether a most interesting, though exacting, labor to investigate its many recesses whereto the skill of respective counsel in their briefs and thorough arguments have led us. It has been instructive to sift, where found, the ore of truth and principle from the record's many pages and resolve their complexities to the doing of justice. The contest consumed almost five months for trial in the lower court. In course of preparation for presentation on appeal to this court nearly four months elapsed. It is a voluminous record that has heavily drawn upon the industry and learning of the trial court, and the ability and zeal of eminent counsel engaged on either side. Each has played his part well and is to be commended. I feel somewhat, as I believe counsel do too, that if there had been less of haste and impatience to prepare and get the record here, they could have the better aided our understanding to more readily grasp the essential points, and removed many of the impediments to an earlier conclusion than was otherwise possible. However, in a cause with such pronounced political flavor, and under the circumstances of

excitement necessarily attending, all has been done to aid this court that was reasonably possible, and we are grateful.

It remains now but to state a conclusion. From a patient and calm consideration of it all, I am of the deliberate judgment that at the general election held in Arizona on the seventh day of November, 1916, George W. P. Hunt, the contestant in the court below and appellant here, received of the legal votes cast for Governor the number of 28,094, and that Thomas E. Campbell, the contestee and appellee, received 28,051; the majority for Hunt being in number 43 votes. This court will pronounce judgment.

It is therefore hereby adjudged:

That said George W. P. Hunt was at the general election held in the state of Arizona on the seventh day of November, 1916, and is now, the duly elected Governor of the state of Arizona for the official term beginning on the first Monday in January, A. D. 1917; that he is entitled to the office with all of its official belongings, and, since the first Monday in January, 1917, to all of its emoluments.

That the certificate of election heretofore issued by the Secretary of State to said Thomas E. Campbell as Governor of the state of Arizona for the official term beginning on the first Monday in January, A. D. 1917, and delivered to him, is now void and of no effect, and that the same be and it is hereby canceled and annulled.

That the compensation of the persons making the inspection of ballots before preparing for the contest shall be fixed by the superior court and be paid by the contestee, Thomas E. Campbell, but that, if the contestant, George W. P. Hunt, has paid the same or any part thereof, he shall have and recover the amount so paid from the contestee. Except as herein provided, each party shall pay his costs in the superior court. Appellant and contestant recovers his costs in this court.

The judgment of the superior court is reversed, with direction to enter judgment in accordance herewith.

CUNNINGHAM, J., concurs.

ROSS, J. (Concurring).—I concur in the opinion of the Chief Justice, except in two respects, and I think these are important enough to justify an expression of my views upon them:

1. I am of the opinion that Wilgus precinct should be counted. Appellant's argument against counting the vote of this precinct is condensed in these few words:

"The facts speak for themselves, and neither invite nor require argument. This precinct was never canvassed, and there is no evidence whatever tending to establish that the votes that were counted by the court were the votes actually cast."

If the fact that these ballots were not opened and canvassed by the board of supervisors is sufficient reason for their rejection, it was error for the court to count them. Otherwise, in my opinion, they were unobjectionable.

It is not disputed that an election was held in Wilgus precinct, and that after all the other precinct returns had been received and canvassed by the board of supervisors, and packages containing the ballots had been turned over to the county treasurer for safekeeping, he discovered under a counter in his office a sealed package on which was the names of the board of election of Wilgus precinct, with the seal intact and no evidence that it had been "tampered with." The clerk of the board of supervisors' explanation of why it was not canvassed by the board was that the returns from the different precincts were brought by transfer wagons from the post-office and the express office and thrown on the outside of the courthouse, and from there removed into the office of the supervisors by the janitor, the returns being placed in one pile and the voted ballots in another, and he says:

"I presume he throwed it [the Wilgus package], in there and it went into the treasurer's office, and that is the only way I can account for it. . . . Evidently as he came in he throwed this Wilgus package in the wrong side and went on."

When the ballots from Wilgus precinct were offered in evidence, appellant's only objection to them was: that they "were not received by the clerk of the board of supervisors, and that they were not canvassed or received in the official returns."

The same objection was interposed to the introduction of the tally sheets from the precinct, and the same objection doubtless was intended to extend to the poll lists. I think the evidence is amply sufficient to sustain a finding that the election officers of Wilgus precinct made their returns to the board of supervisors as required by law; that the returns were·

received by the board, but not canvassed, for the reason that they were misplaced; that subsequently they were transferred from the office of the board of supervisors to the treasurer's office, where they were discovered in an unbroken sealed package and forwarded to the superior court of Maricopa county with the other ballots of Cochise county.

There was no objection to the tally sheet or poll list, to the effect that they were not properly authenticated and certified by the proper election officers of Wilgus precinct, or that they did not tally with the number of voted ballots from the precinct, or that the ballots were not genuine; the only objection being that they had not been received by the clerk of the board of supervisors and canvassed by the board.

I am of the opinion that the integrity of the returns—tally sheet, poll list and ballots—was fully established by the evidence, and that the court correctly counted the ballots. If the returns of a precinct may be rejected on the sole ground that they were not canvassed by the board of supervisors, it will open a most fruitful field for fraud, and make it possible for election boards or clerks of boards of supervisors to disfranchise the elector after he has voted, and thereby defeat the will of a majority. Whether these ballots are counted or not will not affect the result in this case, but the rule their rejection establishes is portentous as a guide in the future.

If the election officers or others had destroyed the election returns of Wilgus, or if they had never turned up as evidence of how the voters voted for Governor, still it seems to me the choice of that precinct might have been shown by other legal proof. As is said in *People* v. *Thacher*, 55 N. Y. 525, 536, 14 Am. Rep. 312–321:

"In election cases, if the return is discredited, so that it is no longer evidence of the right of the party claiming under it, then the question who received the majority of the votes is to be ascertained by other legal proof. The vote of the district or precinct to which the return relates is not to be disregarded. The electors ought not to be disfranchised because no return is made or because it has been rendered valueless by the fraud or mistake of others."

2. There are 28 ballots, the counting of which is assigned as error by appellee because, he claims, they had distinguishing marks on them. Eighteen of these were counted for appellant, and 9 for appellee. Without discussing the so-called

distinguishing marks, or passing upon the question as to whether the marks on them were distinguishing or not, I do wish to say I cannot believe the rule announced as to these ballots by the Chief Justice a correct interpretation of the law. That rule, as I understand it, is that, if the board of election indorse on a ballot information indicating that the board, in canvassing the vote of the precinct, discovered distinguishing marks, or what might be called such, then the court will pass judgment upon the ballot and determine whether, as a question of law, the marks are distinguishing or not; or, if the marks on ballots have the appearance or suggest that they are the result of a scheme or concerted plan, then the court may assume as a fact that they are distinguishing marks. But if the board of election neglects to do its legal duty and indicate that any marks were on the ballot when canvassing the vote, and if the marks in and of themselves do not indicate by their persistence or regularity, or otherwise, an intention to identify them, then the court should presume they were not placed on the ballots by the voters, and should count them. This rule absolutely ignores the other rule that requires the integrity of the ballot to be established before it may be taken as evidence to overcome the official canvass. The integrity of the ballot, as I understand it, means that it has been kept from the time it is placed in the ballot-box, after the voter has marked it, unchanged in any way. It being shown that no opportunity to tamper with the ballot existed, or if one did, they, in fact, were not changed or mutilated, the presumption follows that they are the best evidence as to how the voter voted, and as to the marks he used to indicate his choice. If the marking on the ballot is regular and in strict conformity with the law, it is presumed that it is his mark. What of it, if the ballot, in addition to being regularly marked, has upon it marks not provided by law? I think the presumption should prevail in the one case as well as the other that the voter, and not someone else, did the marking, and if there be identifying marks upon it, that he put them there. If it can be presumed that someone else put the distinguishing marks on the ballot, that presumption should also go to the proper markings, and thus you have destroyed its integrity. The ballots, where they have been kept inviolate, are the best evidence, and, in a proper case, may be used to overcome the canvass and return of the elec-

tion board. *Quigley* v. *Phelps*, 74 Wash. 73, Ann. Cas. 1915A, 679, 132 Pac. 738. This seems to be the universal rule. Since boards of election act in a ministerial capacity only, the counting or rejecting of ballots by them is not binding upon the courts. Neither is it taken for granted that every ballot counted by them was at the time unexceptionable. If that presumption were indulged, it would be a waste of time for the courts to look to the ballots to determine whether they had been correctly counted or not; for the return would be the best evidence, instead of the ballots.

I might also add that I do not believe the *Tebbe* v. *Smith Case,* 108 Cal. 101, 49 Am. St. Rep. 68, 29 L. R. A. 673, 41 Pac. 454, is controlling as to the vote in Pinedale precinct. I think there is a clear distinction between our statute and the California statute. The vote of Pinedale precinct, in my opinion, was properly counted.

Application for rehearing denied.

On validity and construction of law as to marking ballots, see notes in 13 L. R. A. 761; 47 L. R. A. 806; 32 L. R. A. (N. S.) 730.

As to whether marking some but not all of the candidates on a party ticket defeats the effect of marking under the party emblem as a vote for the omitted candidates, where no votes were cast for their opponents, see note in 28 L. R. A. (N. S.) 460.