193 P.2d 447

## GROUNDS v. LAWE.

### No. 5008.

Supreme Court of Arizona.

April 26, 1948.

Crawford & Baker, of Prescott, for appellant.

Charles P. Elmer and Carl D. Hammond, both of Kingman, for appellee.

La PRADE, Justice.

The appellant and the appellee were opposing candidates for the office of County Supervisor in District No. 3, Mohave County, Arizona, at the general election held November 5, 1946. The result of the official canvass was: Appellant Grounds 478 votes; appellee Lawe 489 votes. Appellee Lawe was declared elected by the canvassing board and a certificate of election issued to him. Appellant will hereafter be referred to as contestant and appellee as contestee.

The contestant filed a contest of election which, after an inspection of the ballots cast by voters voting in person and by absentee ballots, proceeded to trial and judgment to the effect that contestant take nothing by his action and declaring contestee to be duly elected to the office in question. The appeal is from this judgment.

The statement of contest of election of contestant challenged the election of contestee upon four grounds: (1) That the contestee was ineligible to the office for the reason that he was not a resident of Supervisorial District No. 3; (2) that the election board of Short Creek Precinct were guilty of malconduct in permitting persons to vote who were not qualified electors of the precinct, and in counting the votes cast by the unqualified electors; (3) that the absentee election board were guilty of malconduct in permitting persons to vote who were not qualified electors of the supervisorial district, and in counting the votes cast by said unqualified electors; and (4) "That by reason of erroneous counting of (and the casting of illegal) votes, in all voting precincts of Supervisorial District No. 3, as aforesaid, the said W. D. Lawe, did not in fact receive the highest number of votes for the office of Supervisor of District No. 3 of the County of Mohave, State of Arizona." (The words in parenthesis were added by permission of the court as a trial amendment.)

As a result of the inspection conducted prior to the trial, the parties stipulated that each received the following number of unquestioned votes: William F. Grounds 461; W. D. Lawe 484. The trial court found that out of thirty-three questioned ballots fourteen should be counted for Grounds, four for Lawe, and that the remaining fifteen contested ballots should not be counted for either party. At this stage of the proceedings the count was; Grounds 475 votes, Lawe 488.

With reference to the Short Creek Precinct, which was one of the voting

precincts of the Third Supervisorial District of the County, fifty ballots were cast for the contesting parties, ten of which were counted for Grounds and forty for Lawe. The trial court found that, of these fifty votes cast in Short Creek, fifteen had been cast by persons not qualified to vote in Arizona for the reason that they were residents of the State of Utah, though registered as voters in the Short Creek Precinct. No attempt was made by either party to prove for which of the two candidates these fifteen ballots had been cast. The trial court concluded that the election returns of this particular precinct should be purged of the fifteen illegal votes, and that said votes should be deducted from those received by the contestant and contestee in the same ratio as the total vote of the precinct was cast for the respective parties: Grounds, having received ten votes, being one-fifth of the total vote cast in the precinct, had three votes deducted from his total of ten; Lawe, having received four-fifths of the vote, had a total of twelve votes deducted from his original vote of forty. The count then stood; Grounds 472 votes, Lawe 476 votes.

Contestant in his opening brief, with reference to the absentee ballots, argues at great length that at least seventy-one illegal absentee ballots were cast which if purged even on a pro rata basis would leave the contestant as the legally elected supervisor. This matter will be considered later in the opinion.

The trial court made no findings that any of the absentee ballots were illegal but did specifically find

"That the absentee election board of the County of Mohave was not guilty of mal-conduct in casting, counting, tallying, or tabulating the votes of the absentee and disabled voters of the third Supervisorial district of said Mohave County."

The trial judge, at the close of the case, took the same under advisement, and was requested by counsel to make findings of fact and conclusions of law. After the matters had been submitted on briefs, the judge submitted a written decision indicating what the findings of fact would be, the conclusions of law to be drawn therefrom, and that judgment would go for the contestee. At a hearing to consider objections to the proposed findings of fact submitted by contestant, the latter made inquiry as to why the court had made no findings of fact upon the evidence that had been admitted purporting to show the illegality of at least seventy-one of the absentee ballots cast. There is nothing in the minute entries to indicate what action the trial judge took. There is no minute entry indicating that he ordered that the trial amendment alleging that the contestee did not receive the highest number of votes by reason of "the casting of illegal votes" be stricken or disallowed.

180

In any event contestant in his brief says that the trial court "indicated its view that the trial amendment was not broad enough in its scope," whereupon the contestant moved for permission to amend the statement of contest to conform to the proof by adding a paragraph containing additional grounds of contest, which will be specifically considered hereafter. This proffered amendment was denied. The assignments of error may be summarized as follows: That the trial court erred (1) in finding that the contestee was a resident of Supervisorial District No. 3; (2) in refusing to reject the entire vote in Short Creek Precinct; (3) in refusing to reject the irregular and illegal absentee ballots cast, and in refusing to reject the entire absentee ballots; (4) in refusing to permit the amendment offered to conform to the proofs; and (5) in refusing to order judgment for contestant for the reason that the judgment was not supported by the evidence. Appropriate propositions of law were made supporting these several assignments of error. Additional facts will be stated and considered in disposing of the several assignments of error.

The controversy as to contestee's residence arises out of the following fact situation. Mr. Lawe testified that since the year 1925 he had lived continuously in Mohave County Supervisorial District No. 3; that in 1928 or 1929 he acquired a 240-acre ranch in the Wallapai Mountains approximately fifteen miles in a south-easterly direction from the Town of Kingman; that upon purchasing the ranch he, his wife and his daughter moved onto the premises, and have at all times considered it to be their home; that Kingman is his post office address; that during the winters it was necessary for him to move into Kingman in order that his daughter might attend school; that he and his family lived in several rented houses in the East Kingman Precinct, which is one of the precincts making up Supervisorial District No. 3; that his daughter finished eight years of grade school and four years of high school in the Kingman schools; that during summer vacations the family moved back to the ranch; that he spent several days and nights of each week at the ranch looking after his livestock; that in the year 1942 he could not find a place to rent because of the tremendous influx of people into Kingman and the Kingman area occasioned by the war effort, and as a consequence he entered into a contract to purchase a house in the *West* Kingman Precinct in which he and his family began to live and where they are still living when they are not going back and forth to the ranch home in the mountains. Both Mr. Lawe and his wife testified positively that the ranch was their home (legal domicile), and that they never had any intention of changing their home from the ranch to the town of Kingman; that their residence in Kingman was always temporary though more or less continuous due to the exigencies involving the schooling of the

daughter; the war effort, in which both he and his wife engaged; and his duties as a member of the Board of Supervisors.

For some years prior to the 1946 election Mr. Lawe had been a member of the Board of Supervisors from the Third Supervisorial District. The clerk of the Board of Supervisors testified that since the year 1941, whenever Mr. Lawe was not in the office of the Board, the only manner of contacting him was by phone at his home in the Wallapai Mountains.

Contestant, before the trial court and here, lays much stress upon the fact that both Mr. and Mrs. Lawe registered in the year 1934 (being the last time either of them have registered) giving as their place of residence "Kingman, Arizona, Precinct Kingman East." Contestant insists that this declaration of contestee giving Kingman as his place of residence together with all the facts and circumstances of the case is practically conclusive that Kingman was his place of residence rather than Wallapai Mountains. He then concludes that since contestee purchased a home in West Kingman Precinct, which is contained in Supervisorial District No. 2, he was not a qualified elector in East Kingman Precinct or Supervisorial District No. 3.

The rules for determining residence are contained in section 55-512, A.C.A.1939. In the case of Hiatt v. Lee, 48 Ariz. 320, 61 P.2d 401, 107 A.L.R. 444, this court had occasion to construe this section on an appeal from a judgment holding that Hiatt at the time of his death in California in 1926 was a resident of Arizona rather than California. Prior to 1923 Hiatt had unquestionably maintained his residence in Gila County, Arizona. Being a veteran he was entitled to hospitalization at government expense and in 1923 was sent by the government to a general hospital in Denver, Colorado. In 1924 he was transferred to Sawtelle, California. While in California he registered as being a qualified California voter, and made statements to the Veterans Administration that he had permanently transferred his residence to California. Several witnesses testified that deceased was temporarily in California for the benefit of his health, and that at all times he had expressed a fixed intention and desire to return to Arizona as soon as his health would permit. Other witnesses testified that deceased, according to his own statements, had taken up a permanent residence in California and expected to remain there. On review this court held that the credibility of witnesses and the weight, effect, and sufficiency of their testimony are for the trial court to determine, and that on review this court must construe the evidence in favor of the finding of the trial court; and that the registration in California for voting purposes was not conclusive on the question of whether or not the veteran was a resident of Arizona.

Applying the code section and the law laid down in the Hiatt case, we

are constrained to conclude that in this case there was sufficient evidence to justify the holding of the trial court as to the residence of the contestee, even though there were facts and circumstances from which it might have been inferred that contestee was a resident of West Kingman Precinct. This court has long since committed itself to the doctrine that the trial court's finding on conflicting evidence is binding on the Supreme Court on appeal. See Hunt v. Campbell, 19 Ariz. 254, 169 P. 596, 600 and Russell v. Golden Rule Mining Co., 63 Ariz. 11, 159 P.2d 776, citing cases.

We shall now consider the second assignment to the effect that it was error not to reject the entire vote in Short Creek Precinct for the reason that nonresidents were permitted to vote to the extent of affecting the result of the entire election, and prorating was not possible. If the entire Short Creek vote for supervisor was excluded the net result would have been that Grounds would have received 465 votes and Lawe 448 without reference to the absentee ballots. It is the contention of contestant that the true rule is and should be that where sufficient illegal votes are received to change the result of the election the entire vote of the precinct should be rejected, citing 20 C.J., Elections, § 224, page 182, 29 C.J.S., Elections, § 219. He argues that since it is impossible to tell for whom the illegal votes were cast no election can be allowed to depend on such an uncertainty, and that the whole precinct vote for supervisor should be thrown out and the canvassed number of votes from that precinct deducted from the total of each candidate. Where the margin of victory exceeds the number of unidentifiable illegal votes, no problem of consequence is presented because the practical result of the election remains unaffected by the illegal voting. Hunt v. Campbell, 19 Ariz. 254, 169 P. 596, 601, 613. A different situation presents itself where the majority of the winning candidate is less than the number of unidentifiable illegal votes for which no entirely satisfactory solution has been devolved. A review of the cases indicates that there are adherents to and respectable authority for the four following methods of approach: (1) The election may be declared invalid; (2) the vote of the precinct wherein the illegal voting occurred may be rejected; (3) there may be a pro rata deduction of the illegal votes according to the number of votes cast for the respective candidates in the election district; or (4) the illegality may be entirely ignored. At least one text writer has suggested that the only safe procedure to follow is to declare the election invalid. Paine, Elections, section 513. On the other hand, in McCrary on Elections, 4th Ed., sections 495–497, a different view is expressed, thus:

"If an illegal voter, when called as a witness, swears that he does not know for

whom he voted, and it is impossible to determine from any evidence in the case for whom he voted, his vote is not be be taken from the majority. But it does not follow that such illegal votes must necessarily be counted in making up the true result because it cannot be ascertained for whom they were cast. In purging the polls of illegal votes, the general rule is that, unless it be shown for which candidate they were cast, they are to be deducted from the whole vote of the election division, and not from the candidate having the largest number. Of course, in the application of this rule such illegal votes would be deducted proportionately from both candidates, according to the entire vote returned for each. * * * This is probably the safest rule that can be adopted in a court of justice, where there is no power to order a new election, and where great injury would result from declaring the office vacant; but it is manifest that it may sometimes work a great hardship, inasmuch as the truth might be, if it could be shown, that all the illegal votes were on one side, while it is scarcely to be presumed that they would ever be divided between the candidates in exact proportion to their whole vote. But the rule which, in the absence of proof as to how illegal votes were cast, would deduct them all from the majority candidate, is much more unreasonable and dangerous. Of the two evils the least should be chosen. We see here, however, how important it is that it should, if possible, be made to appear, either by direct or circumstantial evidence, for whom each illegal vote was cast. * * * And it is clear, also, that where in such a case no great public inconvenience would result from declaring the election void, and seeking a decision by an appeal to the electors, that course should be adopted. And in a case where it is essential that one or the other party to the contest be confirmed in the office to prevent such public inconvenience, then the second alternative above named should be resorted to, but the third should in no event be adopted."

The author of an annotation appearing in 155 A.L.R. 677 on the treatment of excess of illegal ballots when it is not known for which candidate or on which side of a proposition they were cast, in commenting on the procedure suggested by the text writer Paine to the effect that the only safe procedure to follow is to declare the election invalid, says:

"* * * But to follow in all cases a rule so drastic would seem to ignore certain important factors, such as time, expense, etc. On the other hand, if the illegality is ignored, or if some arbitrary rule of deducting the illegal votes, either all from one candidate, or on a pro rata basis, is adopted, the actual result may be the election of the candidate receiving a minority of legal votes. At first impression it may seem that there is no difference between ignoring the illegal votes and prorating their deduction, but upon examina-

tion this will be shown to be true only where the candidates are running for an office to be filled solely by the voters of the election district where the illegal votes are cast. Where the candidacy is for a public office in connection with an area larger than the election district where the illegal votes are cast and with respect to which the election district contributes but a portion of the entire vote, it will be seen that if the distribution as between the candidates of votes in the election district is not in the same ratio as the distribution of the entire vote of the larger area, different candidates may be declared elected according to whether the illegality is ignored or the votes proportionately deducted according to the vote of the election district. * * *"

In the annotation referred to there is a large collection of cases showing the number of states which has adopted the rule of proportionate deduction in situations similar to the one under consideration.

■ Certainly the irregularities appearing in the Short Creek vote should not be permitted to invalidate the entire election, nor do we believe that the entire vote of the precinct for supervisor should be rejected. To do so would disenfranchise thirty-five of the voters casting legal ballots. The court did not find that there was any fraud in connection with the Short Creek vote. In Hunt v. Campbell, supra, this court considered the advisability of rejecting the votes of an entire precinct

and the disenfranchisement of legal voters. It was there said:

"It is influence of this sort (fraudulent combinations, coercion, and intimidation) in those cases where the extent thereof may be determined with reasonable certainty, which is rarely the case, that it is the duty of the court to purge the returns of such fraud. A court, however, will exercise the power to reject the votes of an entire precinct and disfranchise a body of electors only where an imperative public necessity requires. It will do so as a last resort where it is found impossible to compute the wrong. If the illegal effect may be proven and computed with reasonable certainty, the returns will be purged to that extent only. * * *"

In the case at bar the illegal voters as well as the legal voters were readily identifiable with reasonable certainty, and there is no complaint by either party as to the trial court's judgment in identifying the fifteen illegal voters. Appellant's sole complaint concerns the disposition of the fifteen votes and the court's resort to proration.

■ The Short Creek Precinct, in what is known as the "strip," is one of the most isolated districts of the State of Arizona. The town and school are at Short Creek in Arizona. Some of the residents of the entire community live across the Utah line, and it is readily understandable why they consider themselves an integral part of the Short Creek community. We therefore

conclude that the rule should be that in purging the polls of illegal votes unless it is shown for which candidate they were cast they are to be deducted from the whole vote of the election precinct. In the application of this rule such illegal votes would be deducted proportionately from both candidates according to the entire vote returned for each. To attempt to cast the burden upon either candidate to show for which particular candidate the illegal votes were cast would in most cases be impractical, exceedingly expensive, and would result in interminable delay and uncertainty.

The third assignment of error reads as follows:

"The trial court erred to the prejudice of the appellant in refusing to reject the irregular and illegal absentee ballots cast, and in refusing to reject the entire absentee ballot, for the reason that the evidence clearly disclosed the illegality of such ballots and prorating was impossible."

The first portion of this assignment complains of the action of the trial court in refusing to reject the irregular and illegal absentee ballots. This assignment is not consonant with the allegations contained in paragraph 6 of the statement of contest. The allegations in this paragraph were that the absentee election board were guilty of malconduct for the reason that they permitted persons to vote at said general election who were not *qualified electors;* and that the board were guilty of further malconduct in counting and tallying said votes cast by said *unqualified electors.* The sole complaint of this allegation is that the board were guilty of malconduct in permitting *unqualified electors* to vote. It contains no statement that the absentee ballots were irregular or illegal. There is no assignment of error that the absentee voters were not qualified electors. It is the contention now that their ballots were illegal for the reason that some of the absentee voters had not made the necessary application for absentee ballots at the time the same were issued; that some of the absentee ballots were cast by persons who secured ballots as disabled persons without furnishing a physician's certificate; that votes were cast by absentee voters who failed to execute before the proper officials the affidavit on the reverse side of the envelope; that votes were cast by absentee voters who made applications therefor but the same were not timely; and that certain voters cast absentee ballots who were not absent nor intended to be absent from the county on the date of the election. These present contentions were all contained in the amendment that was offered to conform to the proofs, the refusal of which is the basis for the fourth assignment of error.

In this behalf contestant insists that the rule relating to amendment of pleadings to cause them to conform to the evidence is Rule 15, Rules Civ.Proc., being sections 21-448 to 451, A.C.A. 1939. It is true that the essence of these rules re-

lating to amendments is to provide a procedure whereby the ends of justice may be properly served by providing that every controversy shall be determined on its merits. This rule is not essentially different from the old rules relating to pleading and practice and their determination by this court. This court has always construed our statutes in regard to amendments with a great deal of liberality even when the amendment was offered on a new trial after an appeal. Bryan v. Inspiration Consol. Copper Co., 23 Ariz. 541, 205 P. 904. This rule has no application in jurisdictions such as ours where election contests are not governed by the general rules of chancery practice but rather are considered to be purely statutory. Kitt v. Holbert, 30 Ariz. 397, 248 P. 25, 28. In the latter case, after a rather extensive survey of many cases relating to amendments offered after the time allowed for filing a statement of contest, this court said:

"* * * It therefore appears that the only states which hold election contests to be proceedings of a special nature, and which have passed specifically on the right of amending a statement of contest after the time allowed for filing one had expired by adding thereto averments of a jurisdictional nature, have held positively and emphatically that such amendments cannot be allowed, and have given most logical and cogent reasons for their holdings. * * *"

In Kitt v. Holbert, supra, the original statement of contest did not contain a necessary jurisdictional allegation to confer jurisdiction on the court. In the case under consideration, jurisdiction was conferred upon the court and the question now presented is whether amendments are permissible which attempt to set up additional or new grounds of contest. The rule is stated in 29 C.J.S., Elections, § 270(b) as follows:

"Generally, new parties or grounds of contest cannot be added by amendment, at least after expiration of the time for filing the original pleading; but the rule applies only to new matter going to the jurisdiction, and generally not to new matter which does not set up new grounds of contest."

In Kitt v. Holbert, supra, this court took cognizance of the case of McCall v. City of Tombstone, 21 Ariz. 161, 185 P. 942, 943, in which the court said:

"* * * Election contests are purely statutory. They are unknown to the common law. They are neither actions at law nor suits in equity. They are special proceedings. * * *"

It therefore follows from these prior adjudications that article 15 of chapter 55, A.C.A. 1939, relating to elections, being sections 55-1501 through section 55-1506, was intended to be a comprehensive code relating to this special statutory proceeding. There is no section relating to amendments. We have been led astray in exam-

ining many cases wherein it appears that amendments are freely allowed, but on further examination it is disclosed that in practically all of these cases reliance is had upon a statute specifically or inferentially authorizing amendments. Section 55-1506 reads in part as follows:

"After the contest has started either party may have the ballots inspected before preparing for trial. The party applying for such inspection shall file with the clerk a verified petition stating that he can not properly prepare for trial without an inspection of such ballots, * * *."

This section seems to contemplate that the purpose of inspection of the ballots is to enable a party to prepare properly for trial. The inspection cannot be had until after the statement of contest is filed. It is rather self-evident that after an inspection is had many irregularities may be discovered, including fraud, ballots cast by unqualified electors, illegal ballots, etc. It would seem that the purpose of the inspection is to permit a party to discover these matters and take advantage of them. But such is not the specific reading of the statute, and we are not permitted to read into it what is not there, as much as we personally might feel that an election contest should be determined on its merits rather than on pleadings and a want of statutory authorization. We conclude, therefore, that the trial court was not in error in refusing the amendment offered after trial.

By this reasoning it follows that the trial court was in error in permitting the trial amendment alleging that contestee did not receive the highest number of votes by reason of the casting of "illegal" votes. No cross assignment was made by contestee upon this action of the trial court in allowing the trial amendment, and we will, therefore, consider it as having been lawfully allowed.

We revert to the third assignment of error to the effect that the court erred in refusing to reject the irregular and illegal absentee ballots cast. We might rightfully close this discussion here for the reason that contestant did not assign as error the failure on the part of the trial court to find that the complained-of absentee- ballots were illegal. Argument in contestant's brief cannot take the place of proper assignments of error. Rules of Supreme Court, Rules 7 and 12; In re Hesse's Estate, 65 Ariz. 169, 177 P.2d 217. We gain from the briefs that there were approximately 140 absentee ballots, presumably 140 applications for absentee ballots plus 140 envelopes with endorsements thereon in which the ballots were returned. All of these documents were admitted as one exhibit, being wrapped in seven bundles.

Rule 4 of the Rules of the Supreme Court relates to the preparation and contents of the abstract of record on appeal. Subsection 9 thereof reads as follows:

"Exhibits incapable of being readily incorporated into the abstract may be omitted, but reference must be made to the same in such a way as to identify them and to distinguish them from other parts of the record."

The exhibits referred to were not incorporated in the abstract in toto, nor was reference made to them in the abstract as required by Rule 4, subsection 9, so as to enable this court to identify them and distinguish them from other parts of the record. Contestant in his brief, in referring to the absentee ballots, makes the following statements:

"Numerous fatal irregularities were demonstrated in the absentee voting, such as failure to make application for the absentee ballot; failure to properly execute or acknowledge the affidavit upon the envelope containing the absentee ballot; failure to furnish a doctor's certificate in voting a disabled voter's ballot; voting absentee ballot without the intention to be, or in fact, being absent from the county on election day."

"Ballot after ballot was illegally cast in the absentee voting, and the illegality is chargeable to the electors. * * *"

"In instance after instance in our case, illegal ballots are cast in this election and for these contesting parties; * * *."

"We reiterate that ballot after ballot was issued to absent voters in our case, without the benefit of the prior filing of the application: * * *."

"Forty-three ballots were shown to have been cast by absent voters who, by the admission of the recorder, were furnished ballots without the prior filing of the applications therefor. Eleven ballots were cast by absent voters, as disabled or infirm, without the filing of the prescribed physician's certificate, or within the proper time limit. At least one ballot was cast by an absent voter who applied for the same more than the statutory period prior to the election. At least one ballot was cast by an absent voter who cast the ballot a day before he filed the application. This is in addition to the forty-three ballots mentioned above. At least four ballots were cast by absent voters who made no application therefor, at any time; these are likewise additional to any of the foregoing ballots. At least one ballot was cast wherein the voter failed to sign the application for the ballot; this is also additional. At least eight ballots were cast by voters who failed to acknowledge before a proper officer, or at all, the affidavit on the absentee ballot envelope. At least two persons cast absentee ballots and never intended to be absent, nor were they absent from the county on election day."

The transcript of the evidence and proceedings is contained in five volumes totalling 495 pages. The applications for the absentee ballots and the envelopes in which they were returned constitute approxi-

mately 280 separate documents, concerning 140 of which there is no complaint (which 140 we do not know). This leaves 140 instruments that have not been identified according to the rules, were not identified in the abstract, and have not been identified in the briefs other than by saying that "in instance after instance" "ballot after ballot" was illegally cast. It is a physical impossibility for this court to try to ferret out from 280 instruments which are good and which are bad according to contestant's lights.

■ Contestant says that there were seventy-one absentee ballots that were illegal for one reason or another, but they have not been identified. The duty of specifying and pointing out the alleged illegal irregularities and insufficiencies is a task that should be undertaken by litigants and their counsel. It was never contemplated that such an insurmountable and onerous task should be cast upon the appellate court. Countless pages of the reporter's transcript are consumed by testimony of various witnesses, principally that of the county recorder as to the modus operandi of her office in issuing the applications for absentee ballots, the method of return, etc. This testimony takes up each individual application and envelope. With reference to such a situation, Judge Ross, in Love v. Bracamonte, 29 Ariz. 227, 236, 240 P. 351, 353, said:

" * * * We might sometimes go to the transcript of the testimony for the evidence to sustain a necessary finding of fact to support a judgment of the lower court, but not to overturn it."

For these reasons we decline to consider the assignment of error that the court erred in refusing to reject the so-called irregular and illegal absentee ballots. We are constrained to take this position regardless of the fact that perhaps many illegal absentee ballots were cast and of sufficient number to change the results of the election.

The judgment is affirmed.

STANFORD, C. J., and UDALL, J., concur.